**TEXTILE WORKERS PENSION FUND, Plaintiff,**

v.

**STANDARD DYE & FINISHING CO., INC., et al., Defendants.**

**No. 81 Civ. 2479 (JES).**

United States District Court, S.D. New York.

Oct. 21, 1982.

Ronald E. Richman, Morgan, Lewis & Bockus, New York City, for plaintiff.

Richard R. Bonamo, Attorney for Defendants Wilentz, Goldman & Spitzer, Woodbridge, N.J., for defendants.

## OPINION

SPRIZZO, District Judge:

Plaintiff, Textile Workers Pension Fund (the "Fund"), is a multiemployer pension plan trust established pursuant to written collective bargaining agreements between the Amalgamated Clothing and Textile Workers Union, AFL–CIO (the "Union") and various contributing employers in the dyeing, finishing and printing industry. The Fund administers various pension plans including the Mid-Atlantic Pension Plan (the "Plan"). Defendant, Standard Dye & Finishing Co. Inc. (the "Company"), a corporation which engaged in the business of processing and distributing dye and textile materials, contributed to the Fund pursuant to a series of collective bargaining agreements with the Union.

By early 1980 the Company's sales and profits had declined and a series of cost increases made it unlikely that the Company could continue to operate profitably. After exploring various alternatives, the Company's directors decided to cease operations and liquidate its assets. The bulk of these assets was liquidated on June 6, 1980 for approximately $1,000,000. All the Company's production workers were terminated by June 20, 1980, although several employees remained to perform clean-up work and to dismantle equipment. The last of these employees was terminated on October 31, 1980. The Company continued to make pension fund contributions on their behalf until their termination.

At the time the decision to cease operations and liquidate was made, the governing law, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), permitted an employer to withdraw from a multiemployer plan at any time without incurring liability unless the plan terminated within five years of the employer's withdrawal with insufficient assets to provide employee benefits at the level guaranteed by the Pension Benefit Guaranty Corporation ("PBGC"). *Id.* at §§ 1364, 1381. In the event that the plan did terminate, each employer who contributed to the plan during the five year period preceding termination incurred liability to the PBGC for its share of the funding insufficiency. However, each such contributing employer's liability was limited to 30% of its net worth. *Id.* at §§ 1362(b)(2), 1364.

On September 26, 1980, three months after the Company decided to liquidate its assets, the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), was signed into law. It amended those provisions of ERISA governing withdrawal liability of an employer from an on-going multiemployer pension plan by providing that a withdrawing employer incurs unconditional liability on the date of withdrawal for a proportionate share of the unfunded vested liability of the plan. *Id.* at § 1381 (Supp.1981). The MPPAA expressly provides that its withdrawal liability provisions are retroactive to April 29, 1980. *Id.* at § 1461(e)(2)(A) (Supp.1981).

The Fund calculated the Company's withdrawal liability in accordance with the MPPAA. The assessment approaches $1,000,000. When the Company failed to make the required payments, the Fund commenced the instant action. Thereafter, the Company moved for summary judgment contending that retroactive application of the withdrawal liability provisions of the MPPAA deprives it of due process in violation of the fifth amendment.

Plaintiff contends that the Court need not reach defendant's constitutional argument since the MPPAA was applied to the Company prospectively and not retroactively. The Fund asserts that withdrawal liability under the MPPAA is triggered by either of two events: (1) the permanent cessation of an employer's obligation to contribute under the plan; or (2) the permanent cessation of all covered operations under the plan. *Id.* at § 1383 (Supp.1981). Plaintiff argues that, since the Company was obligated to contribute to the Plan until October, 1980 and since it continued to employ various individuals until October, 1980, it did not withdraw within the meaning of the MPPAA until after the MPPAA was enacted.

■ The Company disputes plaintiff's contention and asserts that it withdrew from the Plan within the meaning of the MPPAA in June, 1980 when it stopped doing business and sold its assets, thereby ceasing all covered operations. The Company further maintains that, in determining whether a statute is retroactive, the significant date is the date when the Company made its decision to liquidate its operations in reliance on the provisions of ERISA. The Court agrees with the latter contention.

■ The fact that the process of liquidation may have extended beyond the date when the MPPAA was enacted is of no consequence. Pension fund liability cannot properly be imposed on the basis of acts incident to a process of liquidation. Similarly, the fact that the Company had a contractual obligation to contribute to the Plan until October of 1980 does not support the conclusion that the enactment of the MPPAA had no retroactive effect.

The decision to liquidate was made in reliance upon the then existing statutory scheme. It is that decision which forms the basis for the withdrawal liability which the Fund seeks to impose on the Company. The Court, therefore, must decide whether Congress, consistent with due process, could properly make the MPPAA applicable to a decision to liquidate made prior to its enactment and to thereby radically alter the pension fund liability consequences resulting from that decision. *See Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir. 1979), *aff'd,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (hereinafter referred to as "Nachman").

■ At the outset, it should be noted that a statute which readjusts economic burdens in the private sector in order to further a legitimate public purpose is not unconstitutional merely because it has some retroactive effect. *See, e.g., Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Nachman,* 592 F.2d 947.[1] The relevant due process inquiry is whether Congress acted rationally in selecting the means to achieve the desired end. *Id.* at 958. In *Nachman,* the Seventh Circuit developed an analysis for evaluating the rationality of a federal statute which retroactively impairs otherwise settled expectations. The Court stated:

> Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interests of the parties affected, whether the impairment of the private interest is effected in an area previously subjected to regulatory control, the equities of imposing the legislative burdens, and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. It must be emphasized that although these factors might improperly be used to express merely judicial approval or disapproval of the balance struck by Congress, they must only be used to determine whether the legislation represents a rational means to a legitimate end.

*Id.* at 960 (citations and footnotes omitted). Applying these precepts to the facts of this case, the Court concludes that Congress did not violate the Company's due process rights in enacting MPPAA.

To fully understand the problem which Congress sought to remedy in providing for retroactive withdrawal liability, it is essen-

1. While the Supreme Court limited its review in *Nachman* to the nonconstitutional question, to wit, whether the employees' vested benefits were "nonforfeitable" within the meaning of Title IV, it did quote portions of the Seventh Circuit's constitutional analysis in a footnote, 446 U.S. at 367 n. 12, 100 S.Ct. at 1729 n. 12. Indeed, courts have suggested that the Supreme Court's holding in *Nachman* constitutes a *sub silentio* affirmance of the Seventh Circuit's reasoning on the constitutional question since it is doubtful that the Supreme Court would have exposed Nachman to substantial liability had it believed ERISA was unconstitutional on its face or as applied. *A–T–O, Inc. v. Pension Benefit Guaranty Corporation,* 634 F.2d 1013, 1024 (6th Cir. 1980); *Peick v. Pension Benefit Guaranty Corporation,* 539 F.Supp. 1025 at 1040 (N.D.Ill.1982).

tial to discuss Title IV of ERISA which established a system of termination insurance which requires the PBGC to pay certain non-forfeitable benefits if a pension plan fails or terminates with insufficient funds.[2] Unlike single employer plans, multiemployer plans were not immediately insured upon ERISA's enactment in 1974. 29 U.S.C. § 1381. Rather, the PBGC was authorized to guarantee benefits in its discretion until January 1, 1978, at which time the guarantees were to become mandatory. *Id.*

Pursuant to ERISA, an employer could withdraw from a multiemployer plan without incurring any liability to the PBGC for the payment of unfunded non-forfeitable benefits unless the plan terminated within five years of that employer's withdrawal. In any event, the withdrawn employer's liability to the PBGC was limited to 30 percent of its net worth. Of course, if the plan terminated more than five years after withdrawal the PBGC and the remaining employers bore full responsibility for any insufficiency.

As January 1, 1978 approached, Congress was advised that several multiemployer plans planned to terminate after the mandatory guarantees went into effect, 126 Cong.Rec. S10099 (daily ed. July 29, 1980) (remarks of Sen. Williams), a circumstance that would substantially increase the burdens on the insurance system, since, after that date, the PBGC would be required to pay non-forfeitable benefits for all qualified multiemployer pension plans.

As a consequence Congress delayed the effective date of the mandatory guarantee program and extended the PBGC's discretionary authority to guarantee benefits to June 30, 1979. Pub.L.No. 95–214, 91 Stat. 1501 (1977).[3] Simultaneously, it directed the PBGC to prepare a report on the multiemployer situation. In essence, the report

indicated that, if all the financially troubled multiemployer plans were to terminate, the insurance system would be so overburdened that the resulting annual premiums needed to fund the liability would be unacceptably high. Pension Benefit Guaranty Corporation, Multiemployer Study Required by P.L. 95–214, at 2 (1978) ("PBGC Report").

The PBGC Report also concluded that the withdrawal liability provisions of ERISA provided incentives which favored plan terminations. *Id.* at 23–24. It is clear that Congress agreed. Indeed, in favorably reporting the proposed MPPAA, the House Education and Labor Committee stated:

> In the case of a financially troubled plan, termination liability creates an additional incentive for employers to withdraw early. In such a plan, contribution increases may be escalating so sharply that termination liability may prove cheaper than continuing the plan. The remaining employers have an incentive to terminate the plan. Where active employees determine that benefits may be provided for them at considerably less cost than current contributions and are satisfied that vested benefits for retirees and others are virtually 100 percent covered by the guarantees, there is an incentive for the union to agree to terminate the plan. The result is to transfer the cost of providing benefits to the insurance system. *The current termination insurance provisions of ERISA thus threaten the survival of multiemployer plans by exacerbating the problems of financially weak plans and encouraging employer withdrawals from and termination of plans in financial distress.*

(emphasis added). H.R. No. 96–889, Part I, 96th Cong., 2d Sess., 54–55, *reprinted in* [1980] Code Cong. & Ad.News 2918, 2922–23

---

**2.** For a detailed discussion of ERISA and the legislative history of the MPPAA see *Peick v. Pension Benefit Guaranty Corporation,* 539 F.Supp. 1025 (N.D.Ill.1982) (Getzendanner, J.).

**3.** The insurance program did not become mandatory until August 1, 1980. Pub.L. No. 96–24,

93 Stat. 70 (1979); Pub.L.No. 96–239, 94 Stat. 341 (1980); Pub.L. No. 96-293, 94 Stat. 610 (1980). A fifth proposal to extend the PBGC's discretionary authority beyond August 1, 1980 failed. 126 Cong.Rec. H6984 (daily ed.).

(hereinafter referred to as "House Education and Labor Report"); *accord, id.* at 60–61, *reprinted in id.* at 2928–29; H.R. No. 96–889, Part II, 96th Cong., 2d Sess., 15, *reprinted in* [1980] Code Cong. & Ad.News 3004 (hereinafter referred to as "House Ways and Means Report").

In order to discourage premature multiemployer plan terminations and to shore up multiemployer plans when withdrawals occurred, thus maintaining both the existence and the economic viability of multiemployer plans, see 29 U.S.C. § 1001a (Supp. 1981); *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025 (N.D.Ill.1982) (hereinafter "Peick"), Congress required employers to fund their proportionate share of the unfunded vested liability upon withdrawal. However, since Congress was aware that "opportunistic" employers might withdraw from their plans prior to the MPPAA's effective date in order to avoid its more onerous withdrawal liability provisions, *see* 126 Cong.Rec. S10156 (daily ed. July 29, 1980) (remarks of Sen. Matsunaga); *id.* at 10101 (remarks of Sen. Javits), Congress imposed that liability retroactively.

The Company's argument that MPPAA is unconstitutional is predicated upon its assertion that, at the time it decided to terminate operations and liquidate its assets, it relied to its detriment on those provisions of ERISA which limited its withdrawal liability. It maintains that, had it known about the increased liability it would incur under the MPPAA, that liability would have impacted its decision to terminate its operations. More particularly, the Company argues that it would have tried to negotiate a sale of assets to a purchasing employer willing to assume its pension obligations, and thus could have minimized or avoided its withdrawal liability entirely. See 29 U.S.C. § 1384 (Supp.1981).[4]

■ However, the fact that the Company's expectations were disappointed is not in and of itself a basis for concluding that the statute violates due process. In *Nachman,* where no due process violation was found, the pension plan agreement expressly excluded employer liability for the payment of unfunded benefits upon termination of the plan and limited employee recourse to the assets of the pension fund. Indeed, the court there observed that, had Nachman known that he would be liable for funding the insufficiency upon termination of the plan, the company either would not have established the plan or would have utilized a more accelerated funding schedule. *Nachman,* 592 F.2d at 961. The question to be resolved here, therefore, is whether the interference with the Company's expectations in this case is so significantly and substantially different than that in *Nachman* as to require a different result.

While it is true that the Company did not know with certitude what its new exposure would be when it made its decision to liquidate, whereas in *Nachman* the opposite was true, that distinction is not significant. The key operative decision in *Nachman* was not its decision to terminate, but rather its decision to enter into the pension agreement in the first place. At that time, although Nachman may have known that plan terminations were subject to some federal regulation,[5] there was no legislative indication that withdrawal liability would be imposed by statute.

In this case, in June of 1980, when the Company's directors liquidated its assets, there not only was pervasive regulation of pension plans generally and withdrawal liability specifically pursuant to ERISA, *compare Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), but there also was and had been a flurry of legislative activity concerning

4. The Company contends that it could have obtained a loan from the Economic Development Authority or could have used its substantial tax loss carry-back to maintain operations for a time sufficient to obtain a qualifying purchaser. Defendant's Memorandum of Law in

Support of Its Motion for Summary Judgment, at 5.

5. Private pension plans were required to comply with a variety of Internal Revenue regula-

the proposed MPPAA,[6] every version of which contained a retroactive withdrawal liability provision.[7] In view of that climate, the Company's directors, as prudent businessmen, surely could be expected to know, and can properly be charged with knowing, that ERISA was likely to be amended and that withdrawal liability under the MPPAA would probably be imposed retroactively. *See United States v. Darusmont,* 449 U.S. 292, 299, 101 S.Ct. 549, 553, 66 L.Ed.2d 513 (1981) (per curiam); *United States v. Hudson,* 299 U.S. 498, 501, 57 S.Ct. 309, 310, 81 L.Ed. 370 (1937); *see also* 126 Cong.Rec. S10158 (daily ed. July 29, 1980) (remarks of Sen. Matsunaga). Indeed, the conclusion seems inescapable that the decision to terminate in June 1980 was born largely of a desire to escape that liability, while at the same time preserving the possibility that, even if a later enacted statute imposed retroactive liability, that statute might be constitutionally challenged.[8]

■ Given these circumstances, Congress did not act irrationally or inequitably in providing for retroactive application of the withdrawal liability provisions of the MPPAA. The danger of mass employer withdrawals was both real and substantial, and the effect of such withdrawals on the financial soundness of multiemployer pension plans a matter of serious national concern.[9] Moreover, the need for retroactive application was reasonably related to, if not essential to, providing an effective solution to the problem with which Congress was faced. Indeed, had the statute not been made retroactive, the incentive to withdraw from these plans before the statute's effective date might well have proved so irresistible that multiemployer pension plans could have been placed in serious jeopardy and the Congressional purpose to protect those plans frustrated.

■ The Company also argues that the most arbitrary feature of the MPPAA, retroactively applied, is that, in contrast to ERISA and the statute upheld in *Usery v. Turner Elkhorn Mining Co.,* Congress made no effort to moderate the MPPAA's impact

---

tions in order to obtain favorable tax treatment. See e.g., Treas.Reg. § 1.401–6 (1963).

**6.** The bill which was to become the MPPAA was introduced into both houses of Congress on May 3, 1979. It was favorably reported by the House Education and Labor Committee on April 3, 1980, House Education and Labor Report, and by the House Ways and Means Committee on April 23, 1980, House Ways and Means Report. The MPPAA was passed by the House on May 22, 1980 by a vote of 374–0, 126 Cong.Rec. H4170 (daily ed.), and by the Senate on July 29, 1980 by a vote of 85–1, 126 Cong. Rec. S10169 (daily ed.). It was signed into law by President Carter on September 26, 1980.

**7.** Indeed, in most versions the provision would have reached back even further into time. When the proposed MPPAA was originally introduced in Congress its retroactive withdrawal liability provision provided for an effective date of February 27, 1979, the date that Congress received the PBGC's first legislative proposal. See 126 Cong.Rec. S10156 (daily ed. July 29, 1980) (remarks of Sen. Matsunaga). No change was made in the effective date until June of 1980 when the Senate Finance Committee determined that it was unnecessarily harsh. *Id.*

**8.** The Company's management disclaims any knowledge as to the extent of and the retroactive nature of the liability ultimately imposed by the MPPAA. Affidavit of Adolph Nazzaro in Support of Defendant's Motion for Summary Judgment, at 4–5. That disclaimer seems hardly credible in view of the extensive Congressional discussion then taking place as to the financial dangers to multiemployer pension plans that could arise from mass withdrawals from these plans. In any event, assuming arguendo that the Company did not *actually* have knowledge, it seems clear that that ignorance must have resulted from a culpable failure to acquaint itself with information publicly available and surely constitutes no equity in the Company's favor.

**9.** Moreover, Congress was sensitive to the fact that withdrawals burden remaining employers since they reduce the contribution base of a plan, thereby depriving it of funds which otherwise would be available to reduce the level of unfunded vested benefits. *See* House Education and Labor Report, at 60, *reprinted in* [1980] Code Cong. & Ad.News 2928; 126 Cong. Rec. S10101, S10158 (daily ed. July 29, 1980) (remarks of Sen. Matsunaga). The statute benefits those non-withdrawing employers whose conduct conformed to the goals Congress sought to achieve.

on the employer.[10] If it is the Company's contention that Congress' failure to provide for gradual phasing in of liability from April 29, 1980 to September 26, 1980, renders its conduct irrational, then the Company's contention must be rejected. In view of the fact that such a provision would have encouraged withdrawals, the Court finds that its omission was most rational. Moreover, the MPPAA does contain features which both moderate the impact of the liability on the withdrawing employer[11] and evidence Congress' intention to impose liability only to the extent necessary to achieve its purpose.[12] While it is true that the Company may now be foreclosed with respect to certain of these ameliatory statutory provisions[13] because it chose to liquidate, that circumstance does not afford a basis for a finding that Congress acted irrationally and unconstitutionally in imposing retroactive liability.

In conclusion, upon balancing the problem to be remedied with the nature and scope of the burden imposed, this Court holds that providing for retroactive withdrawal liability constituted a rational means to a legitimate end. Therefore, the Company's motion for summary judgment is denied.

SO ORDERED.

**10.** ERISA imposed liability for termination of single employer plans in successive, gradual stages. No liability was imposed for plans terminated prior to enactment although insurance coverage was available through the PBGC. 29 U.S.C. § 1381. During the second stage, the period from September, 1974 to May, 1975, the section imposing employer liability became effective, *id.* at § 1362, but the PBGC was authorized to waive or reduce its right to reimbursement from an employer who could not, as a practical matter, continue the plan. *Id.* at § 1304(f)(4). In the next stage, from May, 1975 to December 31, 1975, the employer was fully liable for all benefits payable under its own plan but the PBGC was not authorized to waive recovery. In the final stage, the employer was liable for all benefits payable under ERISA. *Id.* at § 1061. *Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 382-86, 100 S.Ct. 1723, 1736-38, 64 L.Ed.2d 354 (1980). Similarly, with respect to the Black Lung Benefits Act of 1972, the statute in issue in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752, no liability was imposed on mine operators until 1974, and the federal government itself assumed "a substantial portion of the burden for disabilities stemming from the period prior to enactment." *Id.* at 18, 96 S.Ct. at 2893.

**11.** E.g., 29 U.S.C. § 1399(c) (Supp.1981) (permitting withdrawing employer to pay withdrawal liability over time); *id.* at § 1389(a) (de minimus exception generally excusing all assessments under $50,000 and reducing others

under $150,000); *id.* at § 1389(b) ($100,000 absolute exemption and $250,000 limit on sliding scale reductions if instituted by plan trustees); *id.* at § 1399(c)(1)(B) (limiting an employer's withdrawal liability assessment to the first 20 annual payments if more than 20 years is needed to amortize the liability); *id.* at § 1405 (limiting liability when withdrawals result from liquidation or dissolution of an insolvent employer's business); *id.* at § 1387 (requiring the PBGC to promulgate regulations which prescribe the conditions under which an employer who has withdrawn can reduce or vitiate its liability by rejoining its plan.

**12.** See e.g., 29 U.S.C. § 1383(b), (c) and (d) (Supp.1981) (modifying the definition of "withdrawal" for construction entertainment and trucking industries; *id.* at § 1383(f) (authorizing plans to petition the PBGC for permission to adopt rules similar to those set forth in § 1383(b) and (c)); *id.* at § 1384 (providing that withdrawal does not occur solely because, as a result of a bona fide, arm's length sale of assets to an unrelated party, the seller ceases operations, provided the purchaser obligates itself to contribute to the plan in amounts which would insure that the plan's contribution base is not significantly impacted).

**13.** The Company is, of course, now unable to take advantage of 29 U.S.C. § 1384 (Supp. 1981).