**TEXTILE WORKERS PENSION FUND, Plaintiff,**

v.

**STANDARD DYE & FINISHING CO., INC., et al., Defendants.**

**No. 81 Civ. 2479 (JES).**

United States District Court, S.D. New York.

April 23, 1985.

---

Grutman Miller Greenspoon & Hendler, New York City for plaintiff; Ronald E. Richman, of counsel.

Wilentz, Goldman & Spitzer, Woodbridge, N.J., for defendants; Richard R. Bonamo, of counsel.

## OPINION & ORDER

SPRIZZO, District Judge.

### FACTS

The parties have stipulated to the following facts. Plaintiff Textile Workers Pen-

sion Fund ("Pension Fund") is a multiemployer pension plan trust, established pursuant to a collective bargaining agreement between the Amalgamated Clothing and Textile Workers Union, AFL–CIO (the "Union") and various employers in the dyeing, finishing and printing industry. Defendant Standard Dye & Finishing Co., Inc. ("Standard Dye") is a corporation engaged in the business of processing and distributing dye and textile materials, and has contributed to the multiemployer pension plan administered by Pension Fund.

On or about May 6, 1980, Standard Dye notified the Union of its intention to close down and cease all of its operations in the dyeing and textile business. · On June 6, 1980, Standard Dye was formally dissolved by the unanimous vote of its shareholders. In June of 1980, Standard Dye closed its plant, ceased all of its normal business operations, liquidated its assets and began distributing liquidating dividends to its shareholders. During that month, all production workers employed by Standard Dye were terminated. However, three employees were retained to aid in "clean-up work" and in the dismantling of equipment through October of 1980, during which time Standard Dye made contributions to the Pension Fund on their behalf. *See* Stipulation of Material Facts.

Plaintiff now seeks to collect withdrawal assessments made against defendant Standard Dye. Defendants have moved for summary judgment pursuant to Fed.R. Civ.P. 56, contending that Standard Dye had withdrawn from the plan prior to September 26, 1980 and thus liability has been eliminated by § 558 of the Tax Reform Act of 1984, Pub.L. No. 98–369, § 558, 1984 U.S.Code Cong. & Ad.News (98 Stat.) 494, 899.[1]

---

1. The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1461, establishes liability for a participating employer that withdraws from a multiemployer pension plan. Under the MPPAA, a withdrawing employer incurs liability on the date of withdrawal for a proportionate share of the unfunded vested liability of the multiemployer pension plan. 29 U.S.C. § 1381. The MPPAA was signed into law on September 26, 1980, Pub.L. No. 96–364, 94 Stat. 1208 (1980), but created a retroactive liability for all covered employers who withdrew after April 29, 1980. 29 U.S.C. § 1461(e)(2)(A) (1982).

## DISCUSSION

The sole issue presented in this case is whether Standard Dye "completely withdrew" from the Pension Fund prior to September 26, 1980, the effective date of the MPPAA.[2] Plaintiff Pension Fund argues that because Standard Dye continued to employ various individuals through October, 1980, and was obligated to contribute to the Plan for those workers through October, 1980, it did not effect "complete withdrawal," within the meaning of the MPPAA, until after its effective date of September 26, 1980. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 4–5.[3]

Defendants argue that "covered operations," as referred to in 29 U.S.C. § 1383(a)(2), should be construed as those operations which gave rise to the employer's contributions to the pension plan, *i.e.*, the processing and distribution of dye and textile materials. *See* Defendants' Proposed Conclusions of Law, ¶ 7. Defendants assert that those operations ceased no later than June 20, 1980, when Standard

Dye ceased all normal business operations, closed its plant, formally dissolved the company and terminated all of its production workers. *See id.* at ¶ 8. Defendants further contend that the term "covered operations" should not be construed to include work activities, such as clean-up and dismantling of equipment, which are incidental to cessation of normal business activities, even though pension fund contributions are made by the employer for workers performing those incidental activities. *See id.* at ¶ 9.

The only courts which have passed on this issue have agreed with defendants' view of the statute. Thus, in *Speckman v. Barford Chevrolet*, 535 F.Supp. 488 (E.D. Mo.1982), an automobile dealership closed down and sold its facilities prior to the effective date of the MPPAA. The employer retained one employee to perform phaseout work and made pension plan contributions on behalf of that employee subsequent to the effective date of the MPPAA. *Id.* at 489–90.[4] The court in *Speckman* noted that the employer's "retention of a

---

The Pension Fund, observing that Standard Dye had withdrawn after April 29, 1980, the effective date of the statute, calculated withdrawal liability of $1,000,000 in accordance with the MPPAA. When Standard Dye refused to make the required payments, Pension Fund brought an action in the United States District Court for the Southern District of New York. Standard Dye moved for summary judgment, contending that the retroactive application of withdrawal liability under the MPPAA violated its Fifth Amendment rights to due process.

The Court sustained the constitutionality of the retroactive liability provisions, concluding that they "constituted a rational means to a legitimate end." *Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 549 F.Supp. 404, 410 (S.D.N.Y.1982). The Second Circuit affirmed, noting that the MPPAA "plainly bears a reasonable relation to a legitimate governmental purpose." *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.*, 725 F.2d 843, 857–58 (2d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). The Supreme Court upheld the retroactive withdrawal liability provisions of the MPPAA against a constitutional attack in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, — U.S. —, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). Congress, however, in enacting § 558 of the Tax Reform Act of 1984, eliminated the retroactive

application of the MPPAA, thereby voiding any liability arising under the MPPAA for withdrawal from a pension plan prior to September 26, 1980.

2. Under the MPPAA, "a complete withdrawal from a multiemployer plan occurs when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

3. In the previous decision involving these parties it was unnecessary for this Court to decide whether Standard Dye had withdrawn from the plan prior to September 26, 1980 in order to reach the constitutional issue of retroactivity, because the Court concluded that the significant date for determining whether the MPPAA was retroactively applied to Standard Dye was the date Standard Dye made its decision to liquidate its operations in reliance on the pre-existing statutory provisions, and not the date when Standard Dye actually ceased its operations. *See Textile Workers Pension Fund, supra,* 549 F.Supp. at 406.

4. *Speckman* was decided prior to the enactment of the Tax Reform Act of 1984, when the effective date of MPPAA was April 29, 1980.

sole employee and its contribution to the Plan on his behalf ... did not prevent its cessation [of "all covered operations"] from being 'complete' within the meaning of the Act. A permanent cessation can occur even though an employer remains signatory to a collective bargaining agreement requiring contributions to the plan." *Id.* at 491.

In *F.H. Cobb Co. v. N.Y.S. Teamsters Conference,* 584 F.Supp. 1181 (N.D.N.Y. 1984), a distributor of food and non-food items to retail customers ceased its distribution operations and sold its assets prior to the MPPAA's effective date. The company laid off all employees, except for a "skeleton" crew of nine to sixteen employees, who remained to move inventory and equipment until after such date. *Id.* at 1182. The *Cobb* court reasoned that although these remaining employees constituted between 5% and 9% of the company's preclosure work force, the company had "ceased all covered operations within the meaning of the MPPAA." *Id.* at 1184.

Plaintiff in the instant action contends that these cases were decided erroneously, and argues that "covered operations" and "normal business operations" are two distinct concepts. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 5. Plaintiff asserts that a "covered operation" is an operation, covered under a collective bargaining agreement, for which an employer is required to contribute under a plan. *See id.* at 12–13. Thus, in plaintiff's view, "Standard ceased *all* covered operations on October 31, 1980 when all its employees for whom it made pension contributions ceased working for Standard." *See id.* at 3 (emphasis in original).

Plaintiff's argument is not supported by the express language of § 1383(a), or by its legislative history. That statute provides that "a complete withdrawal for a multiemployer plan occurs when an employer—(1) *permanently* ceases to have an obligation to contribute under the plan, *or* (2) *permanently* ceases all covered operations under the plan." 29 U.S.C. § 1383(a) (emphasis added). There is no justification for this Court to accept plaintiff's argument, which would render the second clause of § 1383(a) mere surplusage, especially since it is clear that a court must "give effect, if possible, to every clause and word of a statute." *See Montclair v. Ramsdell,* 17 Otto 147, 107 U.S. 147, 152, 27 L.Ed. 431 (1882); *see also United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937) ("The cardinal principle of statutory construction is to save and not to destroy.")

Moreover, the legislative history demonstrates that Congress clearly contemplated that a complete withdrawal could occur even where, as here, an obligation to make pension contributions for a relatively small number of employees continued. As the House Report on the MPPAA makes clear, "a virtually complete cessation of contributions, *e.g.,* a 98-percent reduction, that has the same effect on the plan as a complete cessation of contributions, is a complete withdrawal." H.R.Rep. No. 869, 96th Cong., 2d Sess. 73, *reprinted in* 1980 U.S. Code Cong. & Ad.News 2918, 2941.[5]

Plaintiff also argues that, since § 1385(b)(1)(A) provides that a decline in contributions of 70% or greater constitutes a "partial withdrawal," to accept defendant's argument would obliterate the distinction between a partial and complete withdrawal. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 7–8. This argu-

---

**5.** Indeed, plaintiff conceded at oral argument that had Standard Dye terminated its entire work force prior to September 26, 1980 and hired an outside staff to perform the dismantling and clean-up activities, a "complete withdrawal" within the meaning of § 1383(a) would have been effected. The Court can find no rational basis for concluding that Congress intended that the substantial withdrawal penalties provided for in the statute should be applied merely because an employer chooses to retain a skeleton crew of its own employees to effect the liquidation rather than engaging other persons to perform the same task.

ment lacks merit. The partial withdrawal contemplated by Section 1385(b)(1)(A) arises when the 70% or more decline in contributions occurs over a period of three consecutive years, *see* 29 U.S.C. § 1385(b)(1)(A) (1982), and clearly does not apply to the brief winding-up periods incidental to liquidation. Moreover, the partial withdrawal provisions of the MPPAA were designed to apply to a situation where an employer ceases some operation(s) while continuing others covered by the applicable multiemployer plan. *See id.* at 1385(b)(2)(A). This has not occurred here. Standard Dye ceased all its operations related to the manufacturing and distribution of dye and textile materials well before the effective date of the MPPAA.

Plaintiff also contends that it would be inconsistent with § 108(e)(1) of the MPPAA to hold that no withdrawal liability exists on facts such as these. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 5–6. That statute provides that in situations where an employer announces its intention to cease operations and does so within twelve months, there is a limitation but not an absence of withdrawal liability. *See* Pub.L. No. 96–364, § 108(e)(1), 94 Stat. 1208, 1269 (1980), *reprinted in* 29 U.S.C. § 1385 app. (1982).

However, that inconsistency is more apparent than real. A decision to cease covered operations, and subsequent cessation within twelve months of the announcement of that decision, is not synonomous with a decision to liquidate, to cease covered operations immediately, and to maintain a skeleton staff for purposes of effecting that liquidation. Obviously, in the former instance the employer could continue its normal business activities during that twelve-month period so that the employer's exemption from withdrawal liability pursuant to 29 U.S.C. § 1383(a) would not apply.

The Court, therefore, finds that defendant Standard Dye, which, prior to the effective date of the MPPAA, closed its plant, ceased its normal business operations, liquidated its assets, and terminated employ-ees engaged in production and distribution activities, effected a "complete withdrawal" from the Plan within the meaning of 29 U.S.C. § 1383(a). Defendants' motion for summary judgment is hereby granted and plaintiff's cross-motion for summary judgment is denied.

It is SO ORDERED.