**Helen DEBRECENI, Fund Manager of the New England Teamsters and Trucking Industry Pension Fund, Plaintiff, Appellant,**

v.

**The OUTLET COMPANY, Defendant, Appellee.**

No. 85–1730.

United States Court of Appeals, First Circuit.

Argued Jan. 8, 1986.

Decided Feb. 18, 1986.

James T. Grady with whom Gabriel O. Dumont, Jr. and Grady, Dumont & Dwyer, Boston, Mass., were on brief, for plaintiff, appellant.

H. Daniel Hassenfeld with whom Paul G. Wallach and Herrick & Smith, Boston, Mass., were on brief, for defendant, appellee.

**14**

Before COFFIN, Circuit Judge, ROSENN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

ROSENN, Senior Circuit Judge.

Helen Debreceni, Fund Manager of the New England Teamsters and Trucking Industry Pension Fund (the Fund), brought suit in the United States District Court for the District of Massachusetts against The Outlet Company (Outlet) to collect $312,890 "withdrawal liability" under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq.* (1982).[1] Pursuant to a 1984 amendment of the MPPAA, an employer who had a binding agreement to withdraw from a pension fund as of September 26, 1980 is exempt from liability under the MPPAA. Outlet had executed a contract in connection with the sale of its business to take effect retroactively on September 25, 1980. This appeal presents a narrow question of first impression: whether a contract dated before but executed after September 26 constitutes a binding agreement on that date for MPPAA purposes. The district court granted summary judgment for Outlet, holding it had a binding agreement as of September 25, 1980, and was exempt. Debrecini appeals. We conclude otherwise and reverse.

## I.

For many years, Outlet owned and operated retail department stores, and employed members of Local Union No. 251 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America under various collective bargaining agreements. These agreements provided for contributions by Outlet on behalf of employees covered by the agreements to the Fund, a multiemployer pension plan.

On August 29, 1980, United Department Stores, Inc. (United) made a written offer to purchase Outlet's department store as-

sets, subject to the execution of definitive agreements of sale. The companies commenced negotiations. According to a letter from United's counsel to Outlet's counsel dated September 14, the companies had before that date reached an agreement in principle—subject to the approval of Outlet's board of directors (the Board) at its September 25 meeting—to sell Outlet's store assets to United. At the September 25 meeting, the Board authorized Outlet's officers to complete the sale or terminate negotiations as they saw fit.

Several days later, on September 30, Outlet's president and vice president signed an "Agreement for the Sale and Purchase of Assets and Capital Stock" (the Agreement). The Agreement had been prepared before the Board's meeting and was signed by United's president by September 26. The Agreement provides in its opening words that it is "made the 25th day of September, 1980," and concludes with the statement that the parties "have *executed* this Agreement *the day and year first above written*" (emphasis added). It further provides: "The execution hereby by the President or a Vice President of the Seller [Outlet] will make this Agreement a binding obligation of the Seller, *enforceable in accordance with its terms*" (emphasis added). Outlet's Board ratified the Agreement on October 30, 1980. The Bill of Sale, notices of assignments of eight separate collective bargaining agreements, and two indemnification agreements executed in November 1980 each refer to the Agreement of Sale "dated as of September 25, 1980." There is no claim or suggestion that the parties to the Agreement dated it and intended that it be effective on September 25, 1980, in anticipation of the 1984 amendment.

The Agreement provides that it is to be construed and governed by the laws of New York. The parties have stipulated that as a result of the Agreement, Outlet ceased to have an obligation to contribute

---

* Of the Third Circuit, sitting by designation.

1. The district court had jurisdiction over determinations of withdrawal liability under the

MPPAA pursuant to 28 U.S.C. § 1331 (1982) and 29 U.S.C. § 1401(b)(1) (1982). This court has jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

to the Fund on or about October 24, 1980. The parties agree that Outlet did not endanger the Fund's financial stability by withdrawing.

On April 30, 1982, Debreceni notified Outlet that the Fund had calculated that the company was liable under the MPPAA for $312,890 withdrawal liability, which she proposed be paid in 83 monthly installments. Outlet did not use the MPPAA arbitration procedures to dispute the amount. Subsequently, Debreceni sent Outlet a notice of default and filed this suit.

During the pendency of the suit, in response to a Supreme Court decision that found constitutional the MPPAA's retroactive application to employers who had withdrawn from multiemployer pension plans before its enactment on September 26, 1980, *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), Congress amended the MPPAA. The amendment, section 558 of the 1984 tax bill, provides that employers who withdrew from pension plans before the MPPAA's enactment on September 26, 1980, or had binding agreements to withdraw before that date and withdrew by the end of 1980, are exempt from withdrawal liability under the Act. *See* Deficit Reduction Act of 1984 (DEFRA), 98 Stat. 494, 899, Pub.L. 98–369, § 558.[2]

Pursuant to section 558, Outlet moved for summary judgment, arguing that its Agreement with United executed after the MPPAA's enactment on September 26 constituted an agreement to withdraw from the Fund which by its terms bound it before that date. Debreceni moved for summary judgment on other grounds. The district court granted Outlet's motion holding

that the defendant "had reached agreement to sell its assets as of Sept. 25, 1980. *See Viacom International Inc. v. Tandem Productions Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), *aff'd*, 526 F.2d 593 (2d Cir. 1975)."

## II.

Congress enacted the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* (1982), in a comprehensive attempt to regulate the funding, management, operation, benefit provisions, and insurance of private employer pension plans. A central purpose in enacting ERISA was "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 374, 100 S.Ct. 1723, 1732–33, 64 L.Ed.2d 354 (1980) (footnote omitted). Under ERISA, an employer who withdrew from a multiemployer pension plan would be liable under some circumstances for its proportionate share of the unfunded portion of vested benefits in the plan. 29 U.S.C. § 1364 (1982). An employer withdrawing from a plan could escape liability if the plan did not terminate within five years of the withdrawal. *Id.*

Congress enacted the MPPAA because it was concerned that many employers were withdrawing from multiemployer plans, gambling that the plans would survive for five years and they would not be liable for unfunded benefits under ERISA. H.R. Rep. No. 869, 96th Cong., 2d Sess., 54–55, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2918, 2922–23. The MPPAA, enacted on September 26, 1980, imposed "withdrawal liability" on any employer who

---

**2.** Section 558 provides in relevant part:
(a) IN GENERAL—
(1) LIABILITY.—Any withdrawal liability incurred by an employer pursuant to part 1 of subtitle E of title IV of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1381 et seq.) [the MPPAA] as a result of the complete or partial withdrawal of such employer from a multiemployer plan before September 26, 1980, shall be void.

\* \* \* \* \* \*

(d) SPECIAL RULE FOR CERTAIN BINDING AGREEMENTS.—In the case of an employer who, on September 26, 1980, has a binding agreement to withdraw from a multiemployer plan, subsection (a)(1) shall be applied by substituting "December 31, 1980" for "September 26, 1980."
*Reprinted in* "Historical Note" accompanying 29 U.S.C.A. § 1381 (1985).

withdrew from a plan after April 29, 1980. An employer's withdrawal liability can be defined as its portion of the present value of a plan's unfunded liability for vested benefits at the time it voluntarily leaves the plan. *See Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.,* 725 F.2d 843, 849 (2d Cir.), *cert. denied sub nom. Sibley, Lindsey & Curr Co. v. Bakery, Confectionary & Tobacco Workers International Union,* —— U.S. ——, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). Congress' purpose in uniformly imposing withdrawal liability was to "relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." H.R.Rep. No. 869, *supra* at 67, *reprinted in* 1980 U.S. Code Cong. & Ad.News at 2935. *See generally Standard Dye & Finishing Co., Inc.,* 725 F.2d at 848–49.

Congress debated the merits of withdrawal liability throughout 1979 and much of 1980. From the beginning, it was agreed that any provision adopted would have retroactive effect, "to prevent employers from avoiding the adverse consequences of withdrawal liability by withdrawing from plans while such liability was being considered by Congress." *R.A. Gray & Co.,* 104 S.Ct. at 2715. Committees in both houses adopted versions of the MPPAA in April 1980, with the retroactively effective date set at February 27, 1979, the day Congress first considered the proposal. *Id.* Following strong lobbying, Congress eased the retrospective burden of the legislation and moved up the effective retroactive date of the MPPAA as enacted to April 29, 1980. *Id.; see* 29 U.S.C. § 1461(e)(2)(A) (1982) (amended 1984).

Following its enactment, many employers hotly contested the MPPAA, raising numerous constitutional issues. Two of these cases are now before the Supreme Court. *Connolly v. Pension Benefit Guaranty Corp.,* No. 84–1555, and *Woodward and Sand Co., Inc. v. Pension Benefit Guaranty Corp.,* No. 84–1567, *argued,* 54 U.S.L.W. 3390 (U.S. Dec. 2, 1985). The

Act's retroactive effect particularly came under attack. *See, e.g., Republic Industries v. Teamsters Joint Council No. 83 Pension Fund,* 718 F.2d 628 (4th Cir.1983) (retroactive provision constitutional), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Shelter Framing Corp. v. Pension Benefit Guaranty Corp.,* 705 F.2d 1502 (9th Cir.1983) (provision unconstitutional), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). The Supreme Court held constitutional the retroactive effect of the MPPAA in *R.A. Gray & Co.,* 102 S.Ct. at 2720. Congress thereupon enacted section 558 of DEFRA, which repealed the retroactive provisions of the MPPAA.

Although the chairman of the conference committee on DEFRA reported that section 558 "was hard fought and one of the most difficult items dealt with in this conference," 130 Cong.Rec. H7091 (daily ed. June 27, 1984) (Rep. Rostenkowski), legislative history on the section is sparse. A staff report of the Joint Committee on Taxation stated that amendment of the MPPAA was necessary because

> [m]any employers who withdrew from multiemployer plans prior to the date of enactment of the MPPAA may have unexpectedly incurred significant retroactive withdrawal liability. The Congress believed that the collection of withdrawal liability payments with respect to the withdrawals that took place during the retroactive period are not necessary to protect the financial integrity of multiemployer defined benefit pension plans.

Staff of Joint Committee on Taxation, 98th Cong., 2d Session, *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984,* at 893 (1985) (*General Explanation*). Congress used virtually identical language to explain the purpose of the provision in its other report on the section. *See* Senate Committee on Finance, *Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984,* S. Print No. 169, 98th Cong., 2d Sess. 337 (1984).

Congress did not address the narrow question raised here, whether an agreement may be made retroactively binding for section 558 purposes. In its two reports, Congress stated that "[i]n the case of an employer who, on September 26, 1980, had a binding agreement to withdraw from a multiemployer plan, the effective date for withdrawal liability is changed to December 31, 1980." S.Print No. 169, *supra; General Explanation, supra.* Nor has the meaning of "binding agreement" been considered by the courts that have construed section 558. *See, e.g., Long Island Oil Products v. Local 553 Pension Fund,* 775 F.2d 24, 31 (2d Cir.1985) (employer withdrew from a plan before the enactment of the MPPAA and section 558 is constitutional); *Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.,* 607 F.Supp. 570, 574 (S.D.N.Y.1985) (company ceased covered operations under section 558 before enactment of MPPAA, although winding up continued for next month).

Congress had recognized, in initially enacting the MPPAA, that some of its provisions might be unduly harsh. It provided a mechanism for the Pension Benefit Guaranty Corporation (PBGC) to exempt certain classes of transactions from withdrawal liability. *See* 29 U.S.C. § 1384(c) (1982). The PBGC is the government agency charged with insuring multiemployer plans under ERISA. Under 29 U.S.C. § 1384 (1982), the seller of a business with a multiemployer plan to a purchaser who will make subsequent contributions[3] to the plan can avoid withdrawal liability by meeting certain requirements. Pursuant to its authority under this section to grant class exemptions, the PBGC found in 1982 that "when a sale of assets occurred before or shortly after enactment of the Multiemployer Act, it is likely that the sale was a normal business transaction undertaken without regard to the question of withdrawal liability." Notice of Class Exemption, 47 Fed. Reg. 34,662, 34,663 (1982). PBGC there-fore facilitated the sale of business assets by exempting from withdrawal liability sales transactions that occurred "shortly" after enactment of the Act but were consummated before January 1, 1981, when the purchaser continues to pay into the pension plan. *Id.* The PBGC decision was under another provision of the MPPAA, and in any event is not precedentially binding in deciding whether Outlet's Agreement should be given retroactive effect. It significantly illustrates, however, both that the problem of employers acting after enactment of the MPPAA but unaware of its effect was evident two years before Congress passed section 558, and that Congress had available a workable statutory scheme to address the problem.

The repeated statement in Congressional reports that Congress intended section 558 to protect the "[m]any employers who *withdrew from multiemployer plans prior to the date of enactment* of the MPPAA," *General Explanation, supra* (emphasis added); S. Print No. 169, *supra* (emphasis added), suggests that Congress was concerned about employers who withdrew in reliance on *existing* pre-MPPAA law. By contrast, Outlet is seeking relief from a contract it executed after the already-enacted MPPAA. Had Congress been concerned about parties in Outlet's position, it could have included in section 558 a discretionary provision, such as that used by the PBGC in granting exemptions under 29 U.S.C. § 1384 (1982), as discussed above. Although Outlet apparently signed the Agreement ignorant of the effect of the MPPAA, we do not believe that the language of section 558 or its legislative history permits a grant to Outlet of more favorable treatment than any other employer who entered a binding agreement to withdraw from a plan after enactment of the MPPAA.

Congress, obviously after considerable discussion and debate, decided that September 26, 1980, was a logical and practical

---

**3.** This section does not apply to the Agreement before us because United did not intend to con-tinue contributions to the Fund.

cut-off date which would relieve employers who had bound themselves to withdraw before the MPPAA's enactment from undue hardship imposed upon them by its original retroactive provisions. By selecting that date, Congress effectively eliminated the retrospective application of *Pension Benefit Guaranty Corp. v. R.A. Gray & Co., supra.* Congress could have selected the end of the month or the end of the year as a cut-off date but it concluded that the date of the enactment of the MPPAA, September 26, was most acceptable. In light of the historical development of the legislation, we believe that, except as to those sales requiring contributions to the pension plan by purchasers of assets, Congress intended that September 26 be a firm, fixed, and unequivocal cut-off point.

A case decided under the MPPAA prior to its amendment by section 558 presented a converse factual situation but a somewhat analogous legal problem. In *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries,* 727 F.2d 1204, 1211 (D.C.Cir.1984), the court held that an employer bound by contract to contribute to a plan until April 30, 1980, could not escape withdrawal liability by its declaration two weeks before that it intended to withdraw on April 30, one day after the retroactively effective date of the MPPAA. "A declaration by one party that it does not intend to continue an obligation beyond the date on which the obligation is to terminate by its terms manifestly does not impair the force of the obligation prior to the termination date." *Id.*

*Stockton* is distinguishable from the present case on the law because prior to the amendment the MPPAA did not make provision for exempting from its coverage employers who bound themselves before its effective date to withdraw after. *See* 29 U.S.C. § 1461(e)(2)(A) (1982) (amended 1984). Section 558 does allow such an exemption, so long as the employer actually withdrew from the plan by the end of 1980. The factual posture of the cases is also different. In *Stockton,* the employer was attempting to accelerate the effect of its decision to withdraw, whereas in the present case, Outlet wishes to give its Agreement retroactive binding effect. Further, the employer in *Stockton* is seeking to give effect to a notice it delivered directly to the plan, which presumably could have protested. Here, Outlet wants to bind adversely the Fund, a third party with no voice in the Agreement, to the Agreement's retroactive effect. In both cases, however, the effective date of the legislation is significant in fixing liability. We believe that the court's reasoning in *Stockton* supports our conclusion that an employer's intent to act before the effective date of the MPPAA is of no consequence unless the statute's crucial temporal requirements are met.

By its terms, Outlet's Agreement is governed by the law of New York. It is well-settled in New York that parties to a contract will not be bound until a written agreement is executed, if that is their intention. *See, e.g., Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 842, 260 N.E.2d 493, 494 (1970). Here, United's offer was made "[s]ubject ... to the execution of definitive agreements of sale," and the Agreement itself provides that it will become a binding obligation of Outlet's only after it is executed by Outlet's president or vice president. Outlet therefore cannot contend that it had entered into a "binding agreement" until its officers signed the Agreement on September 30, 1980. Under the law of New York, Outlet could not be bound to the Agreement by either the agreement in principle it reached with United by September 14 or by its Board's action on September 25 authorizing, inter alia, its officers to sign the Agreement.

Outlet argues, however, that the parties to a contract can mutually make it retroactive, to the detriment of third parties. Outlet and United's intent to be bound on September 25, by Outlet's argument, creates the legal fiction that it had a binding agreement to withdraw as of September 26, and thereby renders Outlet exempt from withdrawal liability under section 558. New York accepts the principle that, in

some circumstances, parties to a contract may bind themselves retroactively. *Viacom*, 368 F.Supp. at 1270; *Matthews v. Jeremiah Burns, Inc.*, 129 Misc.2d 841, 129 N.Y.S.2d 841, 847 (Sup.Ct.1954); *see Buffalo Police Benevolent Association v. City of Buffalo*, 114 Misc.2d 1091, 453 N.Y.S.2d 314, 317 (Sup.Ct.1982). The district court relied upon *Viacom* in granting Outlet's motion for summary judgment, but our examination of *Viacom* and the other cases cited by Outlet does not persuade us that the Agreement in this case would be given retroactive effect under New York law.

Although the *Viacom* district court stated as a general rule that when a written contract provides it shall be effective "as of" an earlier date, it generally is retroactive to the earlier date, 368 F.Supp. at 1270 (citing *Jeremiah Burns, Inc.*), the court made clear in its extensive discussion that it construed the retroactively-dated written contract to be a validation of an already-existing and partially performed oral contract. *Id.* The court found that the contract existed at an earlier date because the parties acted on the supposition that it already existed, and because the parties, unlike the parties in this case, had not intended to require a writing before being bound. *Id.* In *Jeremiah Burns, Inc.*, the court allowed the retroactive amendment of an *already-existing* contract. 129 N.Y.S.2d at 847. In *City of Buffalo*, which presented "somewhat unique" facts, 453 N.Y.S.2d at 316, the court enforced an arbitration clause of a collective bargaining agreement which had been made retroactive to the period between the lapse of the previous contract and execution of the questioned contract. 453 N.Y.S.2d at 317. The *City of Buffalo* court's holding is based partial-ly on the terms of the prior agreement and partially upon the filing of the grievance following execution of the new contract. *Id.* *See also Local Union 1567 v. Orange and Rockland Utilities, Inc.*, 104 A.D.2d 413, 478 N.Y.S.2d 937, 938 (1984).

Each of these prior New York cases holding that contracts may be made retroactive considered the possible effect of subsequent contracts on prior agreements.[4] In *Viacom*, the court gave the written contract retroactive effect to embody the prior oral contract; in *Jeremiah Burns, Inc.*, the retroactive contract amended the prior agreement; and in *City of Buffalo*, the retroactive provision filled a gap between a prior and a current contract. By contrast, no prior contract or outstanding agreement preceded Outlet's Agreement. Although it may be that a New York court would enforce the parties' intent to make the contract retroactively binding as to Outlet and United, nonetheless the claim for retroactive application here is significantly weaker than in prior cases for the reasons just stated and because of the specific cut-off date in section 558 and the policy purposes of the statute.

Even if we were to accept Outlet's claim that its Agreement is retroactively binding between Outlet and United, we are unwilling to go a step further and hold that parties to a contract can make it retroactively binding to the detriment of third persons not party to the contract. To our knowledge, no court has ever so held. Most of the retroactive contract cases discussed above were suits by one party to a contract against another. In cases where the rights of a third party were at issue, the question was which party to the contract was liable or responsible, and not, as

---

4. Nor do court decisions in other jurisdictions offer stronger support for making Outlet's Agreement retroactive. *See, e.g., Brewer v. National Surety Corp.*, 169 F.2d 926, 928 (10th Cir.1948) (written employment contract given retroactive effect under Oklahoma law to first date of performance after parties reached an oral agreement); *American Cynamid Company v. Ring*, 248 Ga. 673, 286 S.E.2d 1, 3 (1982) (retroactive date on contract given effect to fill gap of two weeks after expiration of prior iden-tical contract); *Sweetman v. Strescon Industries*, 389 A.2d 1319, 1322 (Del.Sup.Ct.1978) (retroactive date on contract may be given effect where performance had already begun and an oral agreement reached as of the prior date); *Canarus v. Lift Truck Services, Inc.*, 272 Md. 337, 322 A.2d 866, 872–73 (1974) (retroactive date on employment contract not given effect when one party had previously refused the contract with that date, prior understanding that services not under contract).

here, whether the contract's retroactivity protected both parties from liability. *See, e.g., Viacom,* 368 F.Supp. at 1270 (whether the contract retroactively transfers the power of assignment from one party to another); *Sweetman,* 389 A.2d at 1321 (whether the contract retroactively bound one party to indemnify the other).

When parties to a contract attempt to make it retroactive they seek for purposes that advance their interests to create a legal fiction that the contract existed at an earlier date. Analytically, the fiction indulged in is similar to that of the old doctrine, now largely discredited, of "relation back," under which for the sake of equity a contract in some circumstances would be deemed executed as of the moment the contract was offered. As Professor Williston notes, "[w]here the interests of third persons are involved, it is well settled that the fiction of relation back will not be adopted." 1 S. Williston & W. Jaeger, *Williston on Contracts* § 96 at 355 (3d ed. 1957) (footnote omitted). "[I]t is a fiction which cannot be applied where the demands of justice do not imperatively require its application." *Pitcairn v. American Refrigerator Transit Co.,* 101 F.2d 929, 934 (8th Cir.), *cert. denied,* 308 U.S. 566, 60 S.Ct. 78, 84 L.Ed. 475 (1939). We conclude that the fiction of retroactivity also should not be applied to affect adversely the rights of third persons.

Outlet argues that section 558 was intended to protect employers who were taken unawares by the MPPAA, where the employers' withdrawal would not jeopardize the future of a plan. There is no contention that Outlet made its Agreement retroactive to evade withdrawal liability or that Outlet's withdrawal has endangered the future of the Fund. As a general principle of contract law, the intent of the parties to a contract should be enforced, and Outlet intended to conclude the transaction on and to be bound as of September 25. Although we have sympathy for Outlet's position, and recognize that Congress in enacting section 558 offered protection to employers who had acted only a few days before Outlet, we are constrained to

hold that Outlet did not have a binding agreement with United under New York law on September 25, 1980, for the purpose of the section. In fact, the Agreement itself provided that it would not be binding until its execution, and the execution did not occur until September 30. Until the officers affixed their signatures to the instrument on September 30, Outlet could have legally rejected the transaction with United and avoided withdrawal liability to the Fund under the recently enacted MPPAA.

Accordingly, the summary judgment of the district court is vacated and the cause remanded for further proceedings consistent with this opinion.