**I.A.M. NATIONAL PENSION FUND BENEFIT PLAN C and Alan W. Skolnick, Appellants**

v.

**STOCKTON TRI INDUSTRIES.**

No. 83–1290.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1983.

Decided Feb. 14, 1984.

As Amended Feb. 16, 1984.

Robert T. Osgood, Washington, D.C., for appellants.

John T. Hayden, San Francisco, Cal., for appellee.

Before MIKVA, EDWARDS and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This appeal raises several issues under the federal statutes regulating employers' withdrawal from participation in multiemployer pension plans. The case had its genesis when appellant, a large national pension fund, brought this action in the United States District Court for the District of Columbia to collect withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381 *et seq.*, from Stockton TRI Industries ("Stockton" or "the Company"), a California-based corporation. Stockton moved for summary judgment, arguing, among other things, that the Company had completely withdrawn from participation in the plan before the date on which MPPAA imposed withdrawal liability. The district court granted Stockton's motion, holding that the Company completely withdrew from the plan on the date Stockton communicated its intent to withdraw from future participation. Inasmuch as we conclude that the district court, while correct in not requiring arbitration under the particular circumstances presented here, misinterpreted the pivotal statutory term, "complete withdrawal," we reverse the judgment below and remand for further proceedings.

I.

The facts are clear and undisputed. The legal significance of those facts under applicable federal statutes is, however, hotly contested. On May 1, 1977 Stockton entered into a collective bargaining agreement with the International Association of Machinists and Aerospace Workers ("I.A. M."). The agreement, which was to terminate on April 30, 1980, included a provision whereby Stockton was obligated to contribute to the I.A.M. National Pension Fund ("the Fund") for the duration of the contract. Shortly before the contract was due to expire in 1980, Stockton and I.A.M. entered into negotiations to replace the existing agreement. The negotiators advanced an entirely different pension plan proposal that would have required Stockton to make payments into Individual Retirement Accounts ("IRA's") instead of contributing to the Fund.

When agreement in principle was reached on this proposal, Stockton on April 14, 1980, informed the Fund by telegram that the Company would no longer make contributions to the pension plan as of April 30, 1980, the date on which the new IRA pension plan was to be instituted. The April 14 date of notification, as will be seen, is of central importance to the resolution of this appeal.

Stockton's obligations to contribute to the Fund, however, continued under the collective bargaining agreement until April 30, which was after the effective date of the federal legislation at issue here. Accordingly, in May 1980 Stockton made one additional payment to the Fund in fulfillment of its contractual obligations.

Several months later, on September 26, 1980, Congress' enactment of the Multiemployer Pension Plan Amendments Act

transformed the decision to change Stockton's retirement benefits program into a potentially momentous event. MPPAA amended the Employee Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, which regulates employer pension plans to protect the financial interests of plan participants. Except in unusual circumstances not present in this case,[1] ERISA had imposed no liability when an employer withdrew from a multiemployer pension plan, such as the Fund. As of 1980, however, MPPAA imposes withdrawal liability on any employer which withdraws from a multiemployer pension plan. 29 U.S.C. § 1381. By its terms, MPPAA imposes this liability retroactively to embrace any employer which withdrew on or after April 29, 1980. 29 U.S.C. § 1461(e)(2)(A).

Approximately one year later, on May 22, 1981, the Fund informed Stockton that the Company's withdrawal liability amounted to $114,282.00, which the Fund asserted was payable in eighteen installments, beginning on July 21, 1981. This amount of alleged withdrawal liability, Stockton maintains, represents approximately one-half of the Company's net worth. In response to the Fund's demands, Stockton on September 24, 1981, contested the entire amount of assessed withdrawal liability and requested arbitration as provided by 29 U.S.C. § 1401.[2] The Fund did not immediately respond to the Company's arbitration request; however, on October 21, 1981, the Fund demanded payment in full of Stockton's entire withdrawal liability, acknowledging the Company's arbitration request, but stating that arbitration should be delayed until the Pension Benefit Guaranty Corporation ("PBGC") promulgated regulations, as required by 29 U.S.C. § 1401(a)(2).

When Stockton refused to pay the full amount of alleged withdrawal liability, the Fund filed this suit, contending that even if the Company were entitled to arbitration, the Fund nonetheless had the right to payment of withdrawal liability while arbitration was pending. 29 U.S.C. § 1401(d).[3] Stockton responded that, to the contrary, the applicable statutory provision, 29 U.S.C. § 1401(b)(1), demonstrated that once a party requested arbitration, no payments were owing,[4] and that the Fund's acceleration of the amount due pending arbitration was inconsistent with the legislative history of MPPAA and its interpretation by the PBGC.[5] Stockton further contended that it

---

1. Until passage of the MPPAA in 1980 a contributor to a multiemployer plan suffered no withdrawal liability under ERISA unless the entire plan terminated within five years of the employer's withdrawal. *See* ERISA, Pub.L. No. 93–406, § 4064, 88 Stat. 1031 (amended 1980). Even then liability was limited to 30 percent of the contributor's net worth. *See* ERISA § 4062, 88 Stat. 1029.

2. Section 1401(a)(1) specifies a period within which a request for arbitration must be made in order to be timely. We need not decide whether Stockton's request for arbitration was timely inasmuch as we hold *infra* that the district court was correct in reaching the issue of whether, on the specific and undisputed facts of this case, Stockton had "completely withdrawn" from the Fund before the retroactive liability date without first requiring the issue to be arbitrated.

3. The first sentence of § 1401(d) provides:
   Payments shall be made by any employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determina-

tion submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

4. The first sentence of § 1401(b)(1) provides:
   *If no arbitration proceeding has been initiated pursuant to subsection (a) of this section,* the amounts demanded by the plan sponsor under 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. (emphasis added)
   For a discussion of the contrary implications of §§ 1401(d) and 1401(b)(1), see *Republic Indus. v. Teamsters Joint Council No. 83 Pension Fund,* 718 F.2d 628, 641 n. 16 (4th Cir.1983). We express no view with respect to the parties' varying interpretations of the statutory provisions concerning employer obligations either during the course of or in the absence of an arbitration proceeding.

5. The PBGC has taken the position that while arbitration is pending, a failure to make an installment payment for withdrawal liability does not accelerate future installment payments. *See Republic Indus. v. Central Pa.*

had withdrawn from the Fund prior to the retroactive liability date of April 29, 1980 and that even if the Company were held to have withdrawn after April 29, 1980, MPPAA's imposition of retroactive liability was so Draconian as to violate requisite due process guarantees of the Fifth Amendment.

The district court ruled that Stockton had in fact completely withdrawn from the Fund prior to the retroactive liability date of April 29, 1980. Interpreting the critical statutory provision in this case, 29 U.S.C. § 1383(a)(1), which defines "complete withdrawal" as occurring when an employer "permanently ceases to have an obligation to contribute under the plan," the district court concluded that Stockton's obligation ceased when the Company notified the Fund on April 14, 1980 of its intent to withdraw. The court concluded that since the withdrawal was effected by this notification prior to the retroactive effective date of the MPPAA, Stockton had incurred no withdrawal liability; accordingly, the court determined that the other issues raised by Stockton need not be reached.

## II.

### A.

The threshold issue before us is whether the district court erred in declining to refer this dispute to arbitration, rather than reaching and deciding the central issue of statutory interpretation in this case. We conclude that, under the specific and undisputed circumstances of this case, the district court's declination was proper.

MPPAA provides that "any dispute between an employer and the plan sponsor ... concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401. The Fund, which was less than eager to engage in arbitration until it ultimately met with judicial adversity, now argues that Congress' establishment of the arbitrative scheme demonstrates that arbitration is the proper forum for initial determination of the date of Stockton's withdrawal from the Fund. Notwithstanding the Fund's enchantment with arbitration, we conclude for the reasons set forth below that resort to arbitration was neither a statutory prerequisite to the district court's jurisdiction, nor in the particular circumstances of this case was arbitration a requirement mandated by jurisprudential considerations.

Federal courts confronted with the issue whether arbitration is required under MPPAA have uniformly analyzed the question as an issue of exhaustion of administrative remedies, not as an issue of an absolute jurisdictional bar *vel non*.[6] The courts have concluded, correctly in our view, that judicial deference to the arbitration process under MPPAA is mandated by the same policies that underlie the principle of judicial deference to administrative agencies.[7]

---

*Teamsters Pension Fund,* 534 F.Supp. 1340, 1343 (E.D.Pa.), *rev'd on other grounds,* 693 F.2d 290 (3d Cir.1982).

**6.** *See, e.g., Republic Indus. v. Teamsters Joint Council No. 83 Pension Fund,* 718 F.2d 628, 634 (4th Cir.1983); *Shelter Framing Corp. v. Pension Benefit Guar. Corp.,* 705 F.2d 1502, 1503, 1508 (9th Cir.1983); *Republic Indus. v. Central Pa. Teamsters Pension Fund,* 693 F.2d 290 (3d Cir.1982); *I.A.M. Nat. Pension Fund v. Schulze Tool and Die Co.,* 564 F.Supp. 1285, 1289 (N.D. Cal.1983).

**7.** Arbitration under MPPAA is quite plainly to be distinguished from arbitration based upon the contractual provisions of a collective bargaining agreement. Judicial deference to the latter kind of arbitration is mandated by Congress' preference that this contractually agreed upon vehicle for dispute resolution be the "final" method of adjustment among parties. 29 U.S.C. § 173. Therefore, agreements to arbitrate are routinely enforced, *see United States Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and judicial review of arbitration decisions is very limited. *See United States v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Under MPPAA, however, the decisions of the arbitrator, like the decisions of a typical administrative agency, are fully reviewable to determine whether applicable statutory law has correctly been applied and whether the findings comport with the evidence. *See* 29 U.S.C. § 1401(a)(3)(A) (pre-

*See, e.g., Republic Industries v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 294 (3d Cir.1983). First, in establishing the arbitrative scheme, as in establishing an administrative agency, Congress has expressed a preference for initial resolution of the dispute in a non-judicial forum. Second, an arbitrator skilled in pension and labor matters, like an agency in a given administrative area, is in theory likely to fashion superior resolutions of disputes within the arbitrator's area of expertise. Third, initial resort to arbitration, like initial resort to an administrative tribunal, promotes judicial economy both because an arbitrator's decision may dispose of the dispute,[8] and because, even if one party appeals the arbitral decision, courts will have the benefit of the arbitrator's sifting of the facts.

### B.

■ The Supreme Court has distinguished between exhaustion requirements that are "statutorily specified jurisdictional prerequisite[s]" and those that are judicially imposed and reflect prudential concerns. *Weinberger v. Salfi,* 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975).[9] In the majority of contexts the Supreme Court has viewed the exhaustion requirement in the latter manner, treating exhaustion as a jurisprudential doctrine and evaluating the specific circumstances of the particular case to determine whether the principle should be applied. *See, e.g., United States v. McKart,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969). Only when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision, as in the Social Security Act at issue in *Salfi,*[10] has the Supreme Court held that exhaustion is a jurisdictional prerequisite. Because Congress has not clearly stated in MPPAA that a court cannot decide an issue without first requiring arbitration, we conclude that arbitration under MPPAA is not a statutorily specified jurisdictional prerequisite.[11]

suming in general that the decision of the arbitrator is correct "unless the party contesting the determination shows by a preponderance of evidence that the determination was unreasonable or clearly erroneous").

**8.** A difference in structure between arbitrative and most administrative schemes, however, makes arbitration in most cases less likely than an administrative agency proceeding completely to forestall litigation. Under MPPAA both parties have a statutory right to challenge the arbitrator's decision. 29 U.S.C. § 1401(b)(2). Whatever the arbitrator's decision may be, some party to the proceeding is likely to have an incentive to challenge it. In the typical administrative scheme, however, the agency is itself a party to the dispute. Therefore, any agency decision in favor of the private party will in theory put an end to the proceedings. For a discussion of the way this difference in structure affects our decision on whether to require exhaustion of the arbitrative remedy in this case see part II. C. *infra.*

**9.** *See also Montgomery v. Rumsfeld,* 572 F.2d 250, 252 (9th Cir.1978) (discussing the distinction and arguing that "[exhaustion] requirements in the first category ... call into play constitutional concerns of separation of powers, and failure to adhere to them necessarily defeats jurisdiction").

**10.** The subsection of the Social Security Act found in *Salfi* to bar jurisdiction provided:

The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. *No findings of fact or decisions of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided.* No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section [1331 *et seq.*] of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h) (emphasis added).

The preceding subsection had specified under what circumstances a claimant could obtain judicial review:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain review of such decision by a civil action commenced within sixty days after the mailing to him of such a decision. . . .

42 U.S.C. § 405(g).

**11.** Although the Supreme Court has not articulated a rationale for refusing to treat non-exhaustion as an absolute bar to jurisdiction in the absence of clear congressional statement, the reasons for this conclusion are abundantly evident. Congress, of course, legislates against a background of judicial procedures. "[S]tatutes have been enacted which define the ap-

Treating exhaustion of the arbitrative remedy provided by MPPAA as a prudential matter rather than a jurisdictional bar is fully supported by precedent in this circuit concerning exhaustion in general and by precedent in other circuits specifically concerning exhaustion under MPPAA. In *Gulf Oil Corporation v. United States Department of Energy*, 663 F.2d 296 (D.C.Cir. 1981), the government argued that section 503 of the Department of Energy Organization Act, 42 U.S.C. § 7193, which, like MPPAA, establishes an elaborate scheme of non-judicial proceedings, should prevent the court from asserting jurisdiction over an action by Gulf Oil until Gulf had exhausted the administrative procedures provided there. The court, however, refused to interpret section 503 as "denying judicial review in all circumstances," agreeing with Gulf's contention that the Social Security Act provisions at issue in *Salfi, supra*, provided "strong evidence that Congress knows how to withdraw jurisdiction expressly when that is its purpose." 663 F.2d at 308 n. 75. *See also Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1157 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980) (arguing in the context of a challenge to an FTC Commissioner's impartiality that the "jurisprudential concerns . . . embodied in the exhaustion doctrine, do not bear on whether a court *has* jurisdiction but only on whether it should *exercise* that jurisdiction") (emphasis in original).

More specifically to the issue at hand, other courts of appeals that have addressed the question of arbitration under MPPAA have uniformly agreed that exhaustion is not an absolute requirement. *See Shelter Framing, supra*, 705 F.2d at 1509 (concluding that the district court correctly reached the issue of MPPAA's constitutionality because of the lack of a "statutory requirement of exhaustion"). *See also Republic Industries v. Teamsters Joint Council No. 83 Pension Fund, supra*, 718 F.2d at 635. In *Republic Industries v. Central Pa. Teamsters Pension Fund, supra*, 693 F.2d at 298, the Third Circuit likewise evinced the view that exhaustion of the arbitrative remedy was not a jurisdictional prerequisite.[12]

We find the foregoing authorities persuasive. Concluding that MPPAA's arbitral system did not constitute a bar to federal jurisdiction, we therefore turn to the question whether, as a prudential matter, the district court should have stayed its hand and required the parties to repair to arbitration.

### C.

At the outset of this more limited analysis, we note that, as a prudential doctrine, the requirement of exhaustion in this circuit is "not inflexible."[13] We have recently had occasion to reaffirm that "when the reasons supporting the doctrine are found inapplicable, the doctrine should not be blindly applied."[14] Because we find

---

propriate relation of agencies and courts." L. Jaffe, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 426 (1965). Historically, courts have treated the exhaustion requirement as a jurisprudential doctrine, shaping its contours to meet the peculiar circumstances of individual cases. Therefore, it should be assumed that Congress understands that this practice will continue, unless Congress clearly indicates that the exhaustion requirement should be absolute. Furthermore, because one of the major policies underlying the exhaustion requirement is judicial economy, the judiciary may reasonably be thought to be uniquely situated to decide when the doctrine should and should not be applied.

12. The Third Circuit stated that the exhaustion doctrine was inapplicable to the case because the plaintiff was making a constitutional attack

on the imposition of retroactive liability. 693 F.2d at 293. However, the court showed a willingness to consider exceptions developed under Third Circuit law to the exhaustion requirement if the exhaustion doctrine had been found applicable to the case. *Id.* at 293, 298. This *dictum* suggests that the court did not view the requirement as an absolute jurisdictional bar.

13. *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1156 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

14. *Athlone Indus. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1488 (D.C.Cir.1983) (quoting *Committee for GI Rights v. Callaway*, 518 F.2d 466, 474 (D.C.Cir.1975)).

that requiring exhaustion will neither lead to the application of superior expertise nor promote judicial economy,[15] we conclude that, as a prudential matter, the district court correctly proceeded to the merits.

First, we note that the issue before the district court was purely one of statutory interpretation. The question below was whether an employer "permanently cease[d] to have an obligation to continue under the plan" under section 1383(a)(1) when the employer expressed the intent to withdraw from the Fund but was still contractually bound to make contributions. No dispute exists in this case that Stockton did in fact send a telegram on April 14, 1980, expressing its intent to withdraw from the Fund. Nor is there any dispute that Stockton's 1977 collective bargaining agreement was never abrogated prior to MPPAA's effective date. Nor is it gainsaid that by the plain terms of the 1977 collective bargaining agreement Stockton was contractually obligated to contribute to the Fund until April 30, 1980. Because there are neither questions of fact nor issues of contractual interpretation to resolve, an arbitrator skilled in pension and labor matters would have no superior expertise to offer.[16]

Second, under the specific circumstances present here, it is unlikely in the extreme that requiring arbitration will promote judicial economy by resolving extrajudicially the dispute between Stockton and the Fund. Under the statute both the Company and the Fund are entitled to bring an action to vacate the arbitrator's award.[17] 29 U.S.C. § 1401(b)(1). In a dispute like this one, it seems highly improbable that a judicial action to vacate the award will not immediately follow on the heels of the arbitrator's decision. Second, requiring exhaustion under the circumstances presented here would not promote judicial economy even in the short-term. The district court would still have had to consider Stockton's other arguments to prevent the Fund from collecting withdrawal liability.[18]

For the foregoing reasons, we conclude that the district court properly addressed the issue presented here on the merits. It is to this remaining issue that we now turn.

### III.

On the issue of statutory interpretation, we are constrained to conclude that the district court erred in construing the governing statutory provision. Section 1383(a)(1) defines "complete withdrawal" from a plan as occurring when an employer "permanently ceases to have an obligation to contribute under the plan." "Obligation to contribute" in turn is statutorily defined as "an obligation to contribute arising under one or more collective bargaining agreements." 29 U.S.C. § 1392(a)(1).

In this case the district court held that Stockton completely withdrew from the Fund on April 14, 1980, when Stockton dispatched the telegram expressing its intent to withdraw as of April 30, 1980. The

15. For a discussion of these policies see part II. A. *supra.*

16. *See generally Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970) ("[W]here the only . . . dispute relates to the meaning of the statutory term . . . [the controversy] presents issues on which courts, and not [administrators] are relatively more expert.") (quoting *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 14, 88 S.Ct. 651, 659, 19 L.Ed.2d 787 (1968) (Harlan, J., dissenting)) (brackets in original).

17. For a discussion of the difference between an arbitrative scheme and the typical administrative scheme see note 8 *supra.*

18. Stockton has mounted a constitutional attack on retroactive liability under MPPAA. Other circuits have uniformly not required exhaustion for facial constitutional attacks. *See Republic Indus. v. Teamsters Joint Council No. 83 Pension Fund, supra,* 718 F.2d at 635; *Shelter Framing, supra,* 705 F.2d at 1509; *Republic Indus. v. Central Teamsters Pa. Pension Fund, supra,* 693 F.2d at 298. Even if the district court had held that the constitutional attack could not go forward *before* arbitration, it still would have had to decide whether the Fund could collect withdrawal liability pending arbitration and, if so, whether it could collect the full accelerated amount it was demanding. *See* notes 4 & 5 *supra.*

district court itself acknowledged, however, that Stockton was contractually obligated to contribute to the Fund until April 30, 1980, under the existing collective bargaining agreement that expired on that date. According to the clear definition contained in section 1392(a)(1), Stockton plainly had an "obligation to contribute" to the Fund until April 30, 1980. Thus, under the definition of complete withdrawal in section 1383(a)(1), the Company could not have "permanently cease[d] to contribute under the plan" until that date. It inexorably follows that, because Stockton did not "completely withdraw" from the Fund before April 29, the MPPAA by its terms imposes withdrawal liability on this employer. 29 U.S.C. § 1461(e)(2)(A).

The difficulty with the district court's contrary conclusion is that the statutory definition of "complete withdrawal," in terms of cessation of an obligation, makes Stockton's expression of *intent to withdraw* irrelevant to the determination of the date of actual withdrawal. A declaration by one party that it does not intend to continue an obligation beyond the date on which the obligation is to terminate by its terms manifestly does not impair the force of the obligation prior to the termination date. We respectfully fail to discern the logic in equating an expression of intent to withdraw with actual withdrawal.[19]

■ Stockton argues, however, that we should uphold the district court's interpretation of section 1383(a)(1) in light of the constitutional question with respect to retroactive withdrawal liability that the district court would have otherwise faced.[20] We decline, however, to confuse the question of what the statute means with the question whether the measure is constitutional. When faced with a statute susceptible to two or more possible interpretations, courts may reasonably choose the interpretation that will avoid a substantial constitutional question. *United States v. Thompson,* 452 F.2d 1333 (D.C.Cir.1971). This venerable principle is rooted in the doctrine of presumptive constitutionality that attaches to legislative enactments.[21] Courts, however, are not at liberty to rewrite an unam-

---

**19.** The district court also relied on *Speckman v. Barford Chevrolet Co.,* 535 F.Supp. 488 (E.D. Mo.1982) in concluding that Stockton's statement of intent to withdraw in fact worked a withdrawal within the meaning of the MPPAA. However, *Speckman,* is not only not controlling, but is readily distinguishable from the case before us. *Speckman* involved the interpretation of the definition of complete withdrawal contained in § 1383(a)(2) rather than in § 1383(a)(1). In *Speckman* a Chevrolet dealer had effectively terminated its dealership on April 7, 1980, but retained one employee who was winding up the dealership's affairs after the retroactive liability date of April 29. The court concluded that Barford had "permanently ceased all operations" under § 1383(a)(2) on April 7 and thus had "completely withdrawn" from the pension plan before the date of retroactive liability, notwithstanding the presence of the one employee. The *Speckman* court supported its interpretation by a statement in the legislative history to the effect that a drastic reduction in contributions would be counted as a complete withdrawal. *See* H.R.Rep. No. 869, 86th Cong., 2d Sess. 73 (1980), U.S.Code Cong. & Admin.News 1980, p. 2918. The case is inapposite to the present situation, where Stockton has never claimed, nor could it, to have ceased operations. To the contrary,

Stockton was contributing on behalf of all its union employees until April 30, 1980, after MPPAA's liability date.

**20.** The two circuit courts that have considered the constitutional question have split on its resolution. *Compare Republic Indus. v. Teamsters Joint Council No. 83 Pension Fund, supra* (upholding the constitutionality of the imposition of withdrawal liability based on a retroactive effective date) and *Shelter Framing v. PBGC, supra* (declaring that the effects of the imposition of liability based on a retroactive date were so harsh and unexpected as to violate due process).

**21.** *See United States v. Five Gambling Devices,* 346 U.S. 441, 448, 74 S.Ct. 190, 194, 98 L.Ed. 179 (1953) ("The principle is old and deeply imbedded in our jurisprudence that this court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative").

For a celebrated discussion of the presumption of constitutionality see Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law,* 7 Harv.L.Rev. 129 (1893) (arguing that statutes should be upheld unless they are unconstitutional "beyond a reasonable doubt").

biguous statutory provision such as the one at issue here to avoid constitutional questions. To do so would do violence to congressional intent and abdicate the judiciary's function. *See In Re King,* 3 Cal.3d 226, 90 Cal.Rptr. 15, 474 P.2d 983, 986 (1970).

### IV.

In light of its decision on the statutory issue, the district court did not have occasion to consider Stockton's other arguments against the collection of withdrawal liability, including Stockton's constitutionally based attack on the retroactive imposition of withdrawal liability.[22] Inasmuch as these issues have not been fully briefed by the parties in this appeal and since the constitutional issue is obviously one of great moment, the case is remanded to district court for further proceedings, consistent with this opinion, to consider those issues.[23]

*Reversed and remanded.*

---

**22.** Besides its constitutional attack, Stockton argues that the Fund had no right to collect or accelerate withdrawal liability once arbitration had been requested. *See* text accompanying notes 4 & 5 *supra.*

**23.** In light of the public importance of the constitutional issue, as to which we express no view whatever, the views of the PBGC, which is charged with the administration of MPPAA, may appropriately be invited by the district court in the exercise of its sound discretion.