**CENTRAL TRANSPORT, INC., et al.**

**v.**

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al.**

**and**

**The MASON AND DIXON TANK LINES, INC.**

**v.**

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al.**

**and**

**MICHIANA TRUCKING, INC., et al.**

**v.**

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al.**

Nos. CIV–2–85–470, CIV–2–85–471 and CIV–2–85–472.

United States District Court,
E.D. Tennessee,
Northeastern Division.

Jan. 17, 1986.

See also 640 F.Supp. 56.

Patrick A. Moran, Vivian B. Perry and Fredric A. Smith, Birmingham, Mich., and Nat R. Coleman, Greenville, Tenn., for Central Transport, Inc., et al.

Howard H. Baker, Jr. and Don C. Stansberry, Jr., Baker, Worthington, Crossley, Stansberry and Woolf, Huntsville, Tenn., and Ed. E. Williams III, Baker, Worthington, Crossley, Stansberry and Woolf, Johnson City, Tenn., for The Mason and Dixon Tank Lines, Inc.

Frank Cummings, Washington, D.C. and James E. Brading and Thomas C. McKee, Herndon, Coleman, Brading & McKee, Johnson City, Tenn., for Michiana Trucking, Inc.

Russell N. Luplow & Diana L.S. Peters, Bloomfield Hills, Mich., Fred Thompson & Penny Harrington, Nashville, Tenn., for defendant.

## MEMORANDUM

HULL, Chief Judge.

This action came before the Court for a hearing on plaintiff's motion for a preliminary injunction. Plaintiffs seek protection in this action from imposition of a Twenty-six ($26) million dollar withdrawal liability assessment by defendant, based on the withdrawn participation from the union pension plan of a single bargaining unit within Mason & Dixon Tank Lines which resulted from this bargaining unit's decertification of the union.

The court has carefully considered the record and the oral arguments made by counsel and will issue a preliminary injunction for the reasons set forth below.

Under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, Congress empowered multiemployer pension funds to assess "withdrawal liability" on an employer withdrawing from participation in the fund. The Pension

Fund (Fund) is able to assess withdrawal liability against an employer when there is a partial withdrawal of participation. 29 U.S.C. § 1381. Under the ·statutory scheme, a partial withdrawal occurs when "the employer permanently ceases to have an obligation to contribute [to the Fund] under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute...." 29 U.S.C. § 1385(b)(2)(A)(i).

The calculation of "withdrawal liability" which is assessed based upon a partial withdrawal, is not limited to the unfunded vested benefits of the employees that precipitated the partial withdrawal, but allows the fund to include in this calculation other unfunded vested benefits, related to the employer, for which the Fund would not otherwise be allowed to assess.

In the present case, Mason & Dixon Tank Lines (Tank Lines) ceased to have an obligation to make Fund contributions on behalf of the employees within the bargaining unit which decertified the union. This particular bargaining unit of Tank Lines is made up of five employees. These five employees voted the union out on November 29, 1983, and terminated their status under union contracts on December 31, 1983. The Fund has asserted withdrawal liability, based upon this triggering event (the withdrawal of the Tank Lines bargaining unit), against some twenty other businesses that are allegedly part of a group of businesses, including Tank Lines, that are under common control. The statute provides that all employees of trades or businesses which are under common control will be treated as if they were employees of a single employer with all of the commonly controlled businesses making up the single employer. 29 U.S.C. § 1301(b)(1). Since this "Control Group" is the "employer" under the statute, withdrawal liability is calculated based upon the contribution history of all members of the "Control Group", and this is how the Fund arrived at the $26 million figure for which it seeks

to hold each member of the alleged Control Group jointly and severally liable.

Plaintiffs in this action have disputed this assessment of withdrawal liability; and, under the statute, disputes over withdrawal liability are resolved by arbitration.[1] 29 U.S.C. § 1401(a)(1). The statute also provides that the Fund may schedule payments on the withdrawal liability, and that the employer is required to make such payments pending the resolution of any dispute over the liability. 29 U.S.C. § 1401(d). In this action the Fund is seeking an order compelling the plaintiffs to make interim monthly payments of $548,571.67. Plaintiffs seek a preliminary injunction to prohibit defendant from attempting to collect the withdrawal liability alleged to be due and owing until the plaintiffs' liability in this matter is established.

In making the determination as to whether a preliminary injunction should issue, the Court is directed to consider four factors:

1. Whether there is a substantial likelihood of success on the merits;

2. Whether the moving party will be irreparably damaged if the injunction is not issued;

3. Whether issuance of the injunction would cause substantial harm to others; and

4. Whether the public interest would best be served by the issuance of the preliminary injunction. *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir.1982).

■ As to the first factor, the Court finds that plaintiffs have demonstrated a substantial likelihood of success on the merits. This determination is based primarily upon the issue of whether Tank Lines was part of the Control Group at the time of withdrawal from the Fund by the five employees. The critical date here is December 31, 1983, the date the five-member collective bargaining unit ceased to op-

---

1. As is subsequently discussed in this Memorandum, the Court has found that arbitration is not a jurisdictional prerequisite to the maintenance of this action.

erate under union contract. If Tank Lines was under the control of plaintiff, Central Transport, Inc., at that time, then Tank Lines was part of the alleged Control Group, and the withdrawal liability asserted by the Fund would stand on a much stronger factual basis. However, although Central Transport had entered into an agreement for the purchase of Mason & Dixon Lines, Inc., the parent of Tank Lines, this agreement was subject to approval by the I.C.C. It is beyond dispute that the agreement did not receive final approval by the I.C.C. until early 1984, and Central Transport did not become the actual owner of Mason Dixon's stock until February, 1985.

Defendant asserts, however, that even though central Transport was prohibited from owning Tank Lines until 1984, a date subsequent to the alleged triggering event, it nevertheless exercised control over Tank Lines prior thereto. Thus, defendant argues, Tank Lines was part of the Control Group prior to the triggering event which prompted this withdrawal liability assessment. Unfortunately for defendant, two factors militate heavily against their theory of "control" by Central Transport.

First, the Interstate Commerce Act prohibits the exercise of any control by the acquiring corporation prior to the issuance of preliminary I.C.C. approval. 49 U.S.C. § 11343, 49 U.S.C. § 11349. The I.C.C. decision which allowed Central Transport to begin to exercise control over Mason Dixon and Tank Lines pending a final decision by the I.C.C., was not served until January 4, 1986. Thus, Central Transport was prohibited by law from exercising any control over Tank Lines prior to January 4, 1986. The Sixth Circuit has indicated that withdrawal liability will not be enforced against the purchaser of a corporation when its operation was beyond the purchaser's control. *In re Challenge Stamping & Porcelain Co.*, 719 F.2d 146 (6th Cir.1983).

Second, defendant is unable to point to any evidence which would support its contention that Central Transport was in control of Tank Lines as of December 31, 1983. Defendant points to provisions in the purchase agreement which limit the actions that may be taken by Mason Dixon and Tank Lines from the date of execution of the agreement until the date Central Transport is given approval to exercise control. Paragraph 11, Stock Purchase Agreement.[2] These provisions, however, merely prevent Mason Dixon and Tank Lines from depriving Central Transport of the benefit of its bargain by requiring maintenance of the status quo. Included are provisions such as: the equipment will be maintained ¶ 11.3, the capital structure will not be altered ¶ 11.5.6, etc., and Central Transport is allowed to inspect and make certain that such changes are not occurring. The Court is unable to find any delegation of control to Central Transport in these provisions.

Central Transport did not acquire Mason Dixon's stock until February, 1985, and it does not appear that they manifested any control over Mason Dixon or Tank Lines prior to January 4, 1984. In fact, Central Transport was prohibited from exercising control prior to January 4, 1984 by the I.C.C. Therefore, it appears that Tank Lines was not part of the alleged Control Group at the time of withdrawal. If Tank Lines was not part of the Control Group, the withdrawal liability which might be assessed by the Fund would be *de minimus*.[3] Since the withdrawal liability asserted by the Fund appears to be based on an erroneous conclusion, plaintiffs have demonstrated a substantial likelihood of success on the merits.

The Court also finds that plaintiffs will be irreparably damaged if an injunction is not issued. Plaintiffs have asserted that the imposition of such a liability would basically force all businesses concerned to shut down and liquidate. Although such

---

**2.** The Stock Purchase Agreement is found as Exhibit B to Central Transport's brief in support of motion for a preliminary injunction.

**3.** Counsel for defendant intimated at oral argument that if withdrawal liability were limited to Tank Lines, the Fund would probably not pursue its collection.

drastic results are not certain, it is certain that the existence of a non-contingent[4] $26 million liability will impair the credit of each of the plaintiff companies, as well as their customer confidence.[5] Such an impairment will inhibit the ability of these businesses to operate, and may indeed result in their demise, even though the Fund's assessment may be wrong. Destruction of the plaintiffs as going concerns is irreparable damage.

On the other hand, the Fund would not be impaired by the issuance of the preliminary injunction. Its existence is not threatened by the delay in collecting the withdrawal liability. Counsel for plaintiffs has asserted that the Fund's 1984 Annual Report reveals surplus income of $386 million out of total income of $2.058 billion. This assertion was not contradicted at the hearing by defendant. It is apparent, therefore, that the fund faces no threat from delay in collecting what will, at most, be a $26 million assessment. This is actually only a small portion of the Fund's total income, and enjoining its collection will not prevent the payment of any vested pension obligations, particularly when one considers that it was to be paid in monthly installments of approximately $500,000.00 over a period of years. Thus, the Court finds that issuance of the injunction will not cause substantial harm to others.

Finally, although the public interest does not form a substantial portion of the basis for this decision, the Court does find that the public interest would best be served by enjoining the enforcement of this withdrawal liability. It is in the public interest to protect the viability of private businesses when the protection will not prejudice other parties, and when the threat to their viability rests upon questionable grounds.

Accordingly, the defendant will be enjoined from pursuing collection of the $26 million withdrawal liability from any of the plaintiffs.

█ The plaintiffs also seek a preliminary injunction to prohibit the defendants from commencing an arbitration proceeding pursuant to the provisions of 29 U.S.C. § 1401(a)(1) against the plaintiffs. Although defendants argue that arbitration is the proper method to resolve this dispute over the payment of withdrawal liability which defendants have assessed against the plaintiff, the exhaustion of an arbitration process is not a prerequisite to district court jurisdiction.

█ The issue of requiring arbitration as a prerequisite has been addressed in *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries,* 727 F.2d 1204 (D.C.Cir.1984), which involved an action brought by a pension fund to collect withdrawal liability under the Multiemployer Pension Plan Amendment Act of 1980. After finding that exhaustion of the arbitration process was not a jurisdictional prerequisite, the Court in *Stockton, supra* at 1209–1210, then found that as a prudential matter it was also proper for the district court to proceed on the merits for two reasons.

First, the court found that it was proper for the district court to proceed on the merits, because the issue before the court was "purely one of statutory interpretation." *Stockton, supra* at 1210. Although the facts in *Stockton* were undisputed, the legal significance of those facts was hotly disputed. In this respect, the case at bar is similar to *Stockton,* because in both cases the interpretation of a critical statutory provision in regard to certain undisputed facts will determine whether or not with-

---

4. The statute provides that the withdrawal liability determination by the Fund is presumed proper. 29 U.S.C. § 1401(a)(3)(A). It is on this basis that the fund is able to compel payment of the withdrawal liability even though arbitration of such a determination is pending. 29 U.S.C. § 1401(d).

5. The United States District Court for the Eastern District of New York found irreparable damage in the assessment of withdrawal liability. "Such a claim, whether valid or not, sends a signal to people in the industry that the company in question is out of business." *Time-DC, Inc. v. Trucking Employees of North Jersey Welfare Fund,* 560 F.Supp. 294, 304 (E.D.N.Y.1983).

drawal liability exists. Whereas the pivotal statutory term in *Stockton, supra* at 1205, was "complete withdrawal", in the case at bar, the Court must look at the terms "employer" and "controlling group".

Second, in *Stockton,* the court looked at the likelihood that requiring arbitration would promote judicial economy by resolving the dispute extrajudicially. The Court found in *Stockton, supra* at 1210, that under the specific circumstances present there, it was "unlikely in the extreme" that arbitration would resolve the dispute. In the case at bar, because the plaintiff, Central Transport, Inc., insists they have no withdrawal liability; and the plaintiff, Mason and Dixon Tank Lines, Inc., only admits a *de minimus* withdrawal liability, while the defendants claim withdrawal liability of $26,295,533.25, it is also extremely unlikely that arbitration could result in an award which would satisfy all parties. In that event, either party is entitled to bring an action in this court to vacate the arbitrator's award. 29 U.S.C. § 1401(b)(1). Therefore, judicial economy would not be served by requiring exhaustion of the arbitrative remedy.

If the plaintiffs are not part of the controlling group or an employer of Tank Lines within the meaning of MPPAA, then obviously there would be no duty to arbitrate. This would be analogous to whether or not there is a contractual duty to arbitrate [See *Refined Sugars v. Loc. 807 Labor-Manage. Pens. Fund,* 580 F.Supp. 1457 (D.C.N.Y.1984)]; and the Supreme Court has held that a judicial determination that a contract did create a duty to arbitrate must precede a compulsory submission to arbitration. *See,* e.g., *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Therefore, because this case involves a statutory interpretation to determine the legal significance of facts which are basically undisputed, and because judicial economy would not be served by requiring arbitration, this court has jurisdiction to hear this case on the merits.

 Once jurisdiction has been established, the All Writs Act, 28 U.S.C. § 1651, gives the Court the power to enjoin the repetitive litigation of the same issue. *Redac Project 6426, Inc. v. Allstate Ins. Co.,* 412 F.2d 1043 (2nd Cir.1969); *State of Michigan v. City of Allen Park,* 573 F.Supp. 1481 (D.C.Mich.1983).

Inasmuch as an arbitration proceeding would relitigate the same issues involved in this case, and because the arbitrator's award could be contested at a later point in this court, 29 U.S.C. 1401(b)(1), it would not be in the public interest or conducive to judicial economy for such a proceeding to be commenced and carried forward.

Therefore, to prevent repetitive litigation of the same issue, the defendant will be enjoined from commencing and prosecuting an arbitration proceeding involving the same issues at bar.