Joseph P. CONNORS, Sr., Donald E. Pierce, Jr., William Miller, William B. Jordan, and Paul R. R. Dean, as Trustees of the United Mine Workers of America 1974 Pension Plan, Plaintiffs,

v.

ECONOMY BUILDING SYSTEMS, INC., Defendant.

Civ. A. No. 85–1615.

United States District Court, District of Columbia.

Dec. 19, 1986.

**850**

Gary M. Ford, Groom & Nordberg, Washington, D.C., for plaintiffs.

William H. Howe, Richard A. Steyer, Loomis, Owen, Fellman & Howe, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

SPORKIN, District Judge.

In this action plaintiffs, as Trustees of the United Mine Workers of America 1974 Pension Plan, are attempting to collect Employee Retirement Income Security Act of 1974 ("ERISA") withdrawal liability payments from defendant Economy Building Systems, Inc. Economy's defense is that it suspended all of its covered operations before the September 26, 1980 effective date of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1001–1461, as amended, the statute which imposes the obligation of withdrawal liability. The two issues in this case are 1) whether Economy can raise this defense for the first time in this case, having allegedly failed to meet a deadline for bringing the matter to arbitration; and 2) whether Economy did in fact suspend its covered operations before September 26, 1980.

For the reasons stated more fully below, I find that defendant's failure to bring this issue to arbitration is not a jurisdictional bar to this suit, and thus that the withdrawal issue is properly before me for consideration. On that issue, I find that Economy *did* cease covered operations before the effective date of withdrawal liability; therefore, no withdrawal liability should be assessed against it. Accordingly, defendant's motion for summary judgment is granted.

## I. BACKGROUND

The facts in this case are not in dispute. Defendant Economy Building Systems, Inc. ("Economy") is a West Virginia corporation previously engaged in the business of coal mine construction, and a signatory to the National Coal Mine Construction Agreements of 1974 and 1978. These collective bargaining agreements gave rise to an obligation to make contributions to the United Mine Workers of America ("UMWA") 1974 Pension Plan ("Plan"),[1] in amounts relating to the number of hours worked by employees covered by the Agreements.

The last covered project entered into by Economy was a subcontract arrangement with Tri-State Building Sales, Inc., which had a contract to build mine service facilities for the McInnes Coal Mine Company. That project began in 1978 and ended sometime in late 1980. During the prime phase of the contract Economy employed as many as 15 workers at the site; but by August of 1980, only five employees remained. These last five employees were laid off on August 6, 1980.

Economy did no work on the project in September of 1980, but in October of 1980, Economy reemployed two individuals to do a general clean up and to install door hardware. These employees worked a total of 33 hours each between October 14 and October 17, 1980. Thus Economy performed sixty-six hours of work after September 26, 1980, for which it contributed $49.50 to the Plan.

On May 25, 1983, the plaintiffs herein, the board of trustees of the Plan, ("Trustees"), sent a letter notifying the defendants of their determination that Economy had

---

1. The Plan is a multiemployer pension plan within the meaning of section 4001(a)(3) of the    Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1301(a)(3).

withdrawn from the Plan between July 1, 1980 and June 30, 1981. The Trustees assessed defendants withdrawal liability in the principal amount of $62,389.22. The May 25 letter also advised defendants of their right to seek review of the Plan's determination, to submit additional information, and to initiate arbitration.

Defendants *did* pursue these rights. Economy requested review and represented that as of the date of this request—June 22, 1983—it had not withdrawn from the Plan because it remained signatory to the National Coal Mine Construction Agreement of 1981 and because it continued to seek work covered under the Plan. Plaintiffs reviewed and rejected defendants determination and notified them some two years later, on March 7, 1985, that its initial assessment of withdrawal liability was correct.

A month after that, on April 1, 1985, Economy wrote to the Plan for another reconsideration, citing for the first time the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494 (1984), which had been passed the previous July. The Tax Reform Act included a provision, § 558, which changed the effective date of the withdrawal liability amendment from April 29, 1980, to September 26, 1980.[2] Given this change of law, Economy changed its objections to the imposition of withdrawal liability arguing that it *had* ceased covered operations, and that in fact, it had done so by the new, September 26, 1980 deadline.

Plaintiffs never responded to this request for reconsideration and on May 6, 1985, Economy submitted a demand for arbitration. Because this demand did not appear to fall within the prescribed time limits, plaintiffs rejected the arbitration route and brought this action instead.

## II.  ARBITRATION

Plaintiffs argue as a preliminary matter that the issue of whether Economy suspended its operations before September 26, 1980, is not properly before the Court because the defendants failed to go through the statutorily required arbitration route. Specifically, they point to Section 4221 of ERISA, 29 U.S.C. § 1401, which provides that arbitration must be initiated within the *earlier* of (a) 60 days after the date the Plan notifies the requester of its decision on the matters raised in the request for review, 29 U.S.C. § 1401(a)(1)(A), or (b) 180 days after the date of the request for review, 29 U.S.C. § 1401(a)(1)(B). Plaintiffs had informed Economy of these provisions in a letter dated May 25, 1983.

Given these provisions, and given the facts outlined above, plaintiffs contend that defendant should have asked for arbitration by December 19, 1983, which was 180 days after its June 22, 1983 request for review, and the earlier of the two statutory deadlines. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment at 13. The plaintiffs assert that defendant's failure to timely arbitrate meant that "Economy waived

---

**2.** The effective date of the Congressional Act establishing withdrawal liability was originally February 27, 1979, the date on which Congress began formally considering the provisions for withdrawal liability. "This date was chosen to prevent employers from avoiding the adverse consequences of withdrawal liability by withdrawing from plans while such liability was being considered by Congress." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984). When Congress finally approved the Bill in April of 1980, it found that this goal had been met and thus moved the effective date forward to April 29, 1980. *Id.* However, the Bill was not actually signed into law by the President until September 26, 1980.

Subsequently, the Supreme Court upheld Congress's retrospective (April 1980) effective date as constitutional. *Id.* Nonetheless, Congress itself *in 1984* changed its mind, and moved the effective date back to September 26, 1980. *See* Tax Reform Act of 1984, Pub.L. No. 98–369 § 558, 98 Stat. 494, 899 (1984).

The 1984 Tax Reform Act thereby granted a reprieve from withdrawal liability to any company, previously thought liable by virtue of having closed shop after April, which could now argue that it had suspended operations before September 26, 1980. Defendant Economy Building Systems is such an employer.

the right to contest the Plan's withdrawal liability assessment ... and that the entire amount of its withdrawal liability is due and owing." *Id.* at 7.

Despite plaintiff's contentions, the D.C. Circuit has heard and decided the same issue against their position, holding that "arbitration under MPPAA is not a statutorily specified jurisdictional prerequisite," but rather "a prudential matter" within the discretion of the district court. *I.A.M. National Pension Fund Benefit Plan v. Stockton TRI Industries,* 727 F.2d 1204, 1208–1209 (D.C.Cir.1984). *See also T.I.M.E.–DC v. Management-Labor W. & P. Funds Etc.,* 756 F.2d 939, 945 (2nd Cir. 1985). Specifically, district courts were instructed to decide whether arbitration should be excused in light of the principles used in administrative law to determine whether a party has exhausted its administrative remedies. *Stockton,* 727 F.2d at 1207, and cases cited at footnote 6.[3]

Economy's failure to seek arbitration by December 19, 1983 must be excused for the two reasons cited in the *Stockton* case: "that requiring exhaustion will neither lead to the application of superior expertise nor promote judicial economy." *Stockton,* 727 F.2d at 1210. The *Stockton* court so held because the issue before the district court in that case "was purely one of statutory interpretation," [4] and because requiring arbitration would not have promoted judicial economy. *Id.* Both of those circumstances are present here.

The parties agree that Economy worked 66 hours after the September 26, 1980 deadline; resolution of the case simply requires a determination of whether the company ceased operations covered by the pension plan notwithstanding this work. Because this is an issue of statutory interpretation, an "arbitrator skilled in pension and labor matters would have no superior expertise to offer." *Id.* Moreover, the statute affords both parties an opportunity to bring an action to vacate the arbitrator's award. 29 U.S.C. § 1401(b)(2). Given the importance of the underlying legal question here, it is probable that such an appeal would follow an arbitrator's determination; since the case will arrive here someday anyway, the most expeditious route is to decide the controversy at this time.

Additionally, this case falls into the futile act exception to the exhaustion doctrine. *See* footnote 3, *supra.* Insisting that Economy should have pursued arbitration by the December, 19, 1983 statutory deadline would be tantamount to requiring a futile act since the legal basis upon which this case is brought—the 1984 Act—did not exist at that point. In other words, the plaintiff's exhaustion argument amounts to the suggestion that Economy waived a defense before it even knew it had such a defense. Economy correctly states that it "should not be deprived of its statutory defenses and be held in default simply because it did not undertake what was then a futile act." Consolidated Memorandum of Points and

---

**3.** While a party will normally be required to exhaust its administrative remedies before seeking judicial relief, *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938), exhaustion will be excused "in exceptional cases or particular circumstances ... where injustice might otherwise result ..." *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). Two such exceptions are (1) when the issue presented is one of purely statutory interpretation, *Stockton,* 727 F.2d at 1210, *McKart v. United States,* 395 U.S. 185, 197–8, 89 S.Ct. 1657, 1664–65, 23 L.Ed.2d 194 (1969), *Touche Ross & Co. v. SEC,* 609 F.2d 570, 577 (2d Cir.1979), and (2) when exhaustion would be futile. *City Bank Farmers Trust Co. v. Schnader,* 291 U.S. 24, 34, 54 S.Ct. 259, 263, 78 L.Ed. 628 (1934), *United*

*States ex rel. Marrero v. Warden, Lewisburg Penitentiary,* 483 F.2d 656, 659 (3rd Cir.1973).

**4.** In addition to the circuit court in *Stockton,* many district courts in ERISA cases have excused exhaustion where the question presented is one of statutory interpretation. *See, e.g., Refined Sugars v. Local 807 Labor-Management Pension Fund,* 580 F.Supp. 1457 (S.D.N.Y.1984); *F.H. Cobb Co. v. N.Y. State Teamsters Pension Fund,* 584 F.Supp. 1181 (N.D.N.Y.1984); *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fun,* 560 F.Supp. 294 (E.D.N.Y. 1983); *Meatcutters Local 88 Pension Plan v. Del Monte Supermarkets, Inc.,* 565 F.Supp. 27 (E.D. Mo.1983); *IAM National Pension Fund v. Schulze Tool and Die Co.,* 564 F.Supp. 1285 (N.D.Cal.1983).

Authorities in Support of Defendant's Cross Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment at 8. In fact, Economy has a right to make its arguments in light of the 1984 changes in the law, especially since its case was pending before the Plan when the legal change took place.

For these reasons, the company's failure to press arbitration some eight months prior to the passage of the law which constitutes the basis its claim will be excused and the company will be granted an opportunity to be heard on the merits of its claim.

## III. MERITS

Economy's single argument in this case is that it completely withdrew from the Plan before the September 26, 1980 effective date of the withdrawal liability provisions and therefore should not be liable for any such withdrawal liability. The MPPAA mandates that an employer effectuates a "complete withdrawal" from a multiemployer plan if it either "permanently ceases to have an obligation to contribute to the plan," 29 U.S.C. § 1383(a)(1), or "permanently ceases all covered operations under the plan," 29 U.S.C. § 1383(a)(2). Defendant relies on the second of these definitions, 29 U.S.C. § 1383(a)(2), arguing that it completely withdrew from the Plan by ceasing covered operations on or before September 26, 1980.

As mentioned above, see pages 850–52, *supra*, it is undisputed that Economy had finished its work on its last project in August, employed no covered workers in the following month, and only two "clean-up" employees for four days in October.

These employees worked only 66 hours in October, for which work the company made contributions to the Plan amounting to a grand total of $49.50. Economy never re-commenced any "covered" operations thereafter.

■ There's little doubt given these facts that Economy had ceased all of its operations covered by the plan. Several courts have already found that such a minimal *amount* work does not defeat a complete withdrawal. *See Speckman v. Barford Chevrolet*, 535 F.Supp. 488, 491 (E.D. Mo.1982); *Textile Workers Pension v. Standard Dye and Finishing Company*, 607 F.Supp. 570 (S.D.N.Y.1985); *F.H. Cobb Co. v. N.Y. State Teamsters Pension Fund*, 584 F.Supp. 1181 (N.D.N.Y.1984).[5]

For instance, in the *Cobb* case, the Court wrote that:

F.H. Cobb will have "permanently ceased all covered operations" within the meaning of the MPPAA if, as it contends, it permanently ceased all covered operations and sold its assets, all in good faith; and terminated all of its employees except for a relatively small number retained temporarily to perform phase-out tasks incident to the closure of operations.

*Cobb*, 584 F.Supp. at 1184. In that case, the retained employees constituted about nine percent of the pre-closure workforce; the court found that amount of worktime did not negate a purported withdrawal. *Id.* at 1185. Here we are dealing with a significantly more compelling factual situation in that Economy finished somewhere between 99.5 and 99.9 percent of its work before September 26, 1980.[6]

---

**5.** Despite plaintiffs' assertions, I do not read the D.C. Circuit's decision in *Stockton* as rejecting the logic of *Speckman* and its progeny. On the contrary, the Circuit Court in *Stockton* distinguished *Speckman* as involving "the interpretation of the definition of complete withdrawal contained in § 1383(a)(2) rather than in § 1383(a)(1)," which was the clause at issue in *Stockton*. *Stockton*, 727 F.2d at 1211, fn. 19. Here, like in *Speckman* not *Stockton,* we are dealing with § 1383(a)(2) not § 1383(a)(1), that is, we are dealing with a claim that the employer ceased covered operations. Such a claim is

"inapposite," *id.,* to the *Stockton* case "where Stockton ... never claimed ... to have ceased covered operations." *Id.* Therefore, I can see nothing in the *Stockton* opinion, which governs in this Circuit, that would contradict the result I reach in this case.

**6.** Economy had worked an average of 14,184 covered hours for each of the three plan years preceeding the year it withdrew. The total hours worked by Economy under the jurisdiction of the Plan exceeds 45,100. Therefore, it is fair to say that Economy completed almost 99.-

In addition to the *de minimus* quantity of work done by Economy after the September deadline, the work these two employees did in October was not the *type* of work in which the company was normally engaged. Defendant was in the mine construction business and was a member of the Plan by virtue of its employment of mine and construction workers. The employees re-hired in October were clean-up workers doing basic maintenance work. Although Economy contributed $49.50 to the Plan for these 66 hours, this work was incidental to the real business of Economy and not of the sort that will defeat a good faith claim that "covered" operations had ceased.[7] Rather, "an employer 'ceases covered operations' if it ceases the business activity that gave rise to contributions to the plan." *Speckman*, 535 F.Supp. at 491 *citing* Ford, McNamara, and Stanger, "Withdrawal Liability Under ERISA After the Mutliemployer Pension Plan Amendments of 1980," *N.Y.U. 39th Annual Inst. on Fed. Tax., ERISA Supp.*, § 10.02[2] at 10–6.

These principles also comport with the legislative purpose behind the MPPAA. Congress intended that a virtually complete cessation of contributions would be treated as a complete withdrawal. The pertinent legislative history reads as follows:

> It is intended ... that a complete withdrawal occurs, as under current law, where an employer has ceased virtually all operations at the facility for which the employer makes contributions to the Plan.... As under current law, a virtually complete cessation of contributions, *e.g.*, a 98–percent reduction, that has the

same effect on the plan as a complete cessation of contributions, is a complete withdrawal.

H.R.Rep. No. 869, 96th Cong., 2d Sess. 68–73 (1980), U.S.Code Cong. & Admin. News 1980, pp. 2918, 2936–2942. Thus to find for the Plan here would defeat Congress's intention in drafting this legislation.

Finally, to find for the Plan would also offend the concept of proportionality. It would be grossly inequitable to hold a company liable for $62,389.22 because of a minimal amount of clean up work performed some two months after the company had suspended its basic operations.

## IV. CONCLUSION

Defendant's failure to press arbitration in this case does not bar it from bringing its statutory defense to the attention of this Court. Upon consideration of this defense, it is clear Economy withdrew from the Plan by ceasing covered operations before the new effective date of withdrawal liability and therefore should not be held liable for withdrawal liability. Accordingly, defendant's motion for summary judgment must be granted.

---

99 percent of its total work before September 26, 1980.

Moreover, Economy performed a total of 12,-483 hours and contributed $9,392.25 to the Plan *in 1980.* Thus the 66 hours and $49.50 contribution for post-September 26, 1980, liability amounts to approximately .5 percent of its 1980 total; in other words, Economy had ceased 99.5 percent of its 1980 operations before September 26, 1980.

**7.** Economy initially contended that it had not ceased covered operations. Subsequent to the 1984 Amendments, the company changed its

argument to assert that it had completely withdrawn from the Plan. Nonetheless, there has been no showing that Economy changed horses in bad faith. Rather, it is fair to assume that Economy did intend to remain in business in 1980; by 1985, though, having engaged in no covered operations for nearly five years, the company could fairly contend that it had withdrawn from the Plan as of its last operation in August of 1980. *See United Food, Etc. v. G. Bartusch Packing Co.*, 546 F.Supp. 852 (D.Minn. 1982).